SAMUEL, Judge.
On January 9, 1958, nine taxpayers and resident owners of real estate on Belfort Avenue and DeSaix Boulevard in the City of New Orleans filed this suit against the Louisiana State Racing Commission, the individual members of that Commission, and the Fair Grounds Corporation seeking to permanently enjoin the Racing Commission from granting to the Fair Grounds Corporation a license to operate a race track in the City of New Orleans, and seeking to permanently enjoin the Fair Grounds Corporation from conducting pari-mutuel wagering within the track area and/or from operating said race track. The original plaintiffs were joined by four others, who intervened making the same allegations and seeking the same relief. There was judgment in the trial court in favor of the defendants, dismissing the suit as to all plaintiffs and intervenors. This devolu-tive appeal was taken by plaintiffs and inter-venors to the Supreme Court of Louisiana by which the matter has been transferred to this court under the pertinent constitutional amendment, LSA-Const. Art. 7, § 30.
For approximately 87 years the defendant Fair Grounds Corporation had operated a track for thoroughbred horse racing in the flat on its premises in the City of New Orleans with the usual racing season beginning each year on Thanksgiving Day and continuing for approximately 85 racing days. With the exception of a very few horses, which are kept in the track area throughout the year and about which there is no complaint, an average of some 900 horses are stabled in various barns owned and operated by the Corporation on their property in the track area during and shortly before and after the racing season. The track in large measure is financed by pari-mutuel wagering conducted in connection with the races and is operated under a permit or license which has been issued each year by the other defendant, Louisiana State Racing Commission.
Petitioners, who live on or near Belfort Avenue (the first street north of the track area), allege that the barns or stables in the vicinity of their homes, and refuse from such barns, together with water permitted to stagnate in pits behind the barns after the horses are washed, emit offensive odors which permeate their homes; that the barns attract and breed large quantities of fleas, flies and rats which invade petitioners* property; that there are loud noises caused by the public address system used for communication with the various barns during the day and noises and obscenity from the barns and track area, particularly during the early morning when the horses are being exercised; that these conditions disturb-the use, enjoyment, peace and quiet of petitioners’ homes and property and have-depreciated the realty value thereof.
Petitioners seek injunctive relief on two-grounds : first, that the race track is an-, illegal operation and therefore a nuisance per se; and second, that the operation of the track is a nuisance in fact.
The answers of the defendants deny the production by them of any odors, flies, fleas, rats, noises and obscenity which invade petitioners’ property and cause the disturbances complained of. The answers also deny that the values of petitioners’ properties have been depreciated. In addition, defendants have filed various exceptions all of which were overruled by the-trial court. Only one of these exceptions has been urged before this court, that of prematurity.
The exception of prematurity is-leveled against petitioners’ contention that the operation of the track is a nuisance in-fact, which of necessity involves the manner in which that operation was conducted. Our attention is called to the fact that at the time of the trial the racing season was-over and the track had been closed until' the opening of the next season, and that, since the date of the filing of the original' petition to the present time, four racing seasons have passed. Exceptors rely upon the rulings in Bell v. Riggs & Bros., 38 La.Ann. 555, Frederick v. Brown Funeral *157 Homes, 222 La. 57, 62 So.2d 100, 39 A.L.R.2d 986, and Gandolfo v. Louisiana State Racing Commission, 227 La. 45, 78 So.2d 504.
These cases held that the establishment and operation of a business not prohibited by law (in Bell a steam engine in a factory, in Frederick a funeral home, and in Gan-dolfo a harness race track) cannot be enjoined as a nuisance in fact prior to its operation or establishment where there does not appear to be any imminent danger or irreparable injury which will result from such operation or establishment.
The cases relied on by exceptors are distinguishable from and not applicable to the instant case. They were instituted before the initial opening of the harness track, the construction and opening of the funeral home and the erection of the steam engine. Gandolfo was careful to point out that the denial of the injunction would not preclude, plaintiffs from bringing a proceeding to abate the nuisance should the harness races, after the track was in operation, be so conducted as to constitute a nuisance in fact. The instant case is quite different from those cited. Here the suit was filed during the operation of the track and during the racing season. Due to no apparent fault of petitioners the matter was not heard until after the racing season was over. But as we have pointed out, horse racing has been conducted at the Fair Grounds track for many years. It is an established, seasonal operation and the necessity of obtaining a permit or license each year does not change this fact. Additionally, the record shows that there is every intention to continue the- operation and this is borne out by the fact that admittedly it has continued for several seasons since the trial. As pointed out in Bell, there is a clear distinction between an established nuisance and a prospective nuisance. For us to hold that this suit is premature would be to hold, in effect, that no suit for the abatement of a nuisance in fact could ever be successful against any seasonal operation unless such suit was actually instituted and heard during a single seasonal operation. Petitioners have a right to be heard on their complaints concerning the alleged nuisance, which they claim has been and is being caused by the operation of the track. The exception of prematurity was properly overruled.
The first of the grounds on which petitioners seek injunctive relief is based on the contentions that pari-mutuel wagering on horse races is gambling in violation of Art. 19, § 8 of the Louisiana Constitution of 1921 and LSA-R.S. 14:90 and, accordingly, the operation of the Fair Grounds track constitutes a nuisance per se; and that, in addition, LSA-R.S. 4:141-163, under which the-Racing Commission operates and grants its-pari-mutuel licenses, are unconstitutional because these provisions grant an improper and excessive delegation of legislative powers to the members of the Commission,, do not establish adequate standards or regulations governing its administration, do not require uniformity and impartiality in the-operation of its provisions, deny equal' protection of law and permit confiscation! of private property.
The first contention as to parimutuel wagering constituting gambling and1 a nuisance per se has been fully answered1 by the Supreme Court in the case of Gan-dolfo v. Louisiana State Racing Commission, supra. Identically the same contentions were made in Gandolfo as are urged' here and there the Supreme Court held that when properly authorized and licensed by the Louisiana State Racing Commission' pari-mutuel wagering is not illegal, is not a nuisance per se, and does not constitute grounds which entitle a petitioner to the injunctive relief sought in the instant case.
The Gandolfo case being indistinguishable from the instant case in connection with the contentions now under discussion, we are not impressed by petitioners’’ argument that since there are at present only three justices still on the Supreme- *158 Court who participated in Gandolfo, two of whom dissented, it is possible that a decision by the present personnel of the court might overrule Gandolfo. The Supreme Court of Louisiana being a superior court to this one, we are bound to follow the decisions of that court and cannot reverse or change any such majority decision regardless of how that court may act at a later date. It is the decision of the Supreme Court itself, and not that of the individuals constituting the court, which is binding upon the Court of Appeal. As we must and do follow Gandolfo, there would be no point in expressing our opinion of these contentions.
In urging their other contention, that LSA-R.S. 4:141-163 are unconstitutional, petitioners rely entirely on the dissenting opinion of Chief Justice Fournet in State ex rel. Magnolia Park v. Louisiana State Racing Commission, 231 La. 720, 735, 92 So.2d 699, 704. Other than as the same may be set out in said dissenting opinion, they have made no argument supporting this contention nor have they pointed to any provision of these statutes which grants an improper or excessive delegation of legislative powers to the members of the Racing Commission or any absence of provisions which fail to establish adequate standards or regulations governing its administration by the Commission, nor any specific failure of the statutes to require uniformity and impartiality in its operation, nor how the statutes deny equal protection of the law or permit confiscation of private property.
State v. Louisiana State Racing Commission, supra, involves a contest between two applicants for a racing permit in the same area. The dissent relied on was chiefly concerned with the fact that the writer thereof was of the opinion that the statutes did not give to the Commission the right to act in what he considered an arbitrary manner and his position was that the interpretation given the statutes by the majority opinion resulted in giving the Commission the right to so act, thus necessarily rendering the statutes unconstitutional. In the dissenter’s opinion the statutes would be constitutional under the interpretation preferred by him. It is important to note that the question of constitutionality was not before the court.
The law is well settled to the effect that where a statute is reasonably susceptible of two interpretations, one of which will render the statute constitutional and the other render it unconstitutional or make that constitutionality doubtful, the court will adopt the interpretation which will render the statute constitutional. Tanner v. Beverly Country Club, 217 La. 1043, 47 So.2d 905; Conley v. City of Shreveport, 216 La. 78, 43 So.2d 223; State v. Arthur Duvic’s Sons, 185 La. 647, 170 So. 23; Southern Coal Co. v. R. & P. Const. Co., 16 La.App. 213, 133 So. 491.
In view of the fact that in the cited Racing Commission case the court had before it two possible interpretations of the statutes and was free to make either one, regardless of an absence of an attack on constitutionality, it was obligated not to make such a choice as would, in itself, render an otherwise constitutional statute unconstitutional. Assuming arguendo that the case does have some applicability to the point for which it has been cited, we feel that of necessity it must have been the view of the majority of the court that the statutes would not be unconstitutional under their interpretation. Therefore the case, and we refer to the majority opinion as the case, gives support to the result directly opposed to the contention of the petitioners. On the showing made by the petitioners we hold LSA-R.S. 4:141-163 constitutional. We make mention of the fact that Gandolfo specifically held these same statutes constitutional. However, the only question before the court in Gandolfo was whether or not the statutes were unconstitutional as a result of the wagering or gambling question alone.
*159 We now address ourselves to the question of whether or not the operation of the race track constituted a nuisance in fact.
Generally petitioners testify that while the barns are cleaned daily the refuse therefrom is placed outside in a pit where it is often allowed to remain for several days before its removal; that this refuse produces a strong, foul odor, especially after a rain, which added to the odor from the stagnant water allowed to remain in ditches behind the barns and to the odors usually associated with barns or stables and a large number of horses, permeate the neighborhood and petitioners’ homes during the racing season.
Petitioners’ testimony relative to their complaints about fleas, flies and rats generally is to the effect that these pests invade their homes and property, particularly during the months of April, May and June after the track has closed.
The testimony about fleas is not impressive in view of the fact that only a few of the witnesses actually complain about the presence of these insects while many of the petitioners have not been bothered by fleas. Even those who make the complaint admit that it is of recent origin and has not been a continuing thing over a period of time. During the months mentioned petitioners do testify that they are annoyed by quantities of flies which invade their yards and which they have great difficulty in keeping out of their houses. These witnesses also testify to the presence of a large number of rats which they say burrow under their concrete, nest under their garages, and cause them trouble and apprehension as to the safety of their children. The only proof offered by the petitioners tending to show that the track area was a source, or a breeding place, of flies was the testimony elicited by their counsel, on cross- examination of the Director of the Bureau of Public Health and Sanitation of the City of New Orleans, to the effect that the United States Public Health Service recommended the removal of manure from the ground within a four day period and from an impervious surface within a seven day period, apparently for the reason that, if allowed to remain longer it may become a breeding place for flies. Nor are we informed why rats, if attracted by the track area, should nest out of that area.
Some, but not all, of the petitioners testify they are annoyed by the public address system. Others, however, and these are also petitioners, are not so annoyed. Several of the petitioners testify about noise and profanity emanating from the barns and from grooms and other race track employees, some of whom apparently sleep in the barns. Here it should be pointed out that, upon receiving such complaints, the track authorities offered to put to an end the alleged noise and profanity but were effectively prevented from successfully attempting to do so because the complainants were unable to identify any individual or group of individuals as the cause thereof. It seems to us that, if the noise and profanity had actually occurred on the numerous occasions alleged and testified to, the complainants, or at least some of them, would have made certain that they could identify the culprits on any occasion occurring after such an offer had been made.
The defense introduced testimony from other persons living in the vicinity which generally was to the effect that they were not annoyed by the things of which the petitioners complained. However, most of these witnesses live a greater distance from the barns on Belfort Avenue than do the petitioners.
In addition, the general manager and the superintendent of the Fair Grounds testified for the defendants. Their testimony was that a spraying machine and - other sanitary measures were regularly used at the track as recommended by the Board of Health; that although many complaints had been received by them from some of the petitioners, they had never received complaints from the patrons of the track *160 concerning the presence of flies, fleas or rats; that as a result of these complaints (from some petitioners) the local Board of Health was requested to send out inspectors, which had been done, and that repeated inspections were unable to find conditions in the track area itself as complained of. The testimony relative to the recommended inspections made by the Board of Health were corroborated by the Director of the Bureau of Health and Sanitation who was also called as a witness. The manager and superintendent also testified that the, refuse from the barns was removed daily and they pointed to the fact that the thoroughbreds at the track, because of their high value, require and receive the best of care including such sanitation as relates to the health of the animals. One of these witnesses, the superintendent, also testified that, some three years before, the Board of Health put 150 rat traps in the barns which traps were examined daily and finally removed after two weeks because only one rat was caught. The superintendent further testified that on one occasion, in an effort to satisfy some of the petitioners, the track sprayed the neighborhood with an insecticide because of the complaints about flies and some two weeks later paid to some of the residents damages arising out of claims that the insecticide spray had killed their flowers.
Three real estate experts, one for the petitioners and two for the defendants, testified on the question of whether or not the presence of the race track depreciates the value of petitioners’ property. Petitioners’ expert, Joseph C. Gandolfo, who was the plaintiff in the Gandolfo case discussed at length above, testified that, while the neighborhood is mixed commercial and residential and contains bars and restaurants as well as homes, the presence of the track depreciates the property in the area at a maximum of 15%. Defendants’ two experts were of the opinion that the presence of the race track did not depreciate the property at all and that in some respects the effect was just the opposite. Other testimony shows a substantial increase in values in the area over a period of years and establishes that rentals present no problem, even some of the petitioners who rent admit that their tenants have been with them for long periods of time.
Here we feel the necessity of pointing out the testimony of one of the petitioners, Mrs. Alice Fredrick, because it does illustrate what appears to be a tendency on the part of at least some of the petitioners to exaggerate. Mrs. Fredrick testified that she has a rental apartment in connection with her home and complained that she has trouble renting her property because prospective tenants object to living close to the track. However, she admitted that her present tenant has been there for two years and that her previous tenant, who had been with her for two or three years, moved only when required to do so because he changed his job. Her only basis for saying that she had trouble in renting her property was the fact that it took several weeks to rent the apartment after the former tenant had moved. We feel this can, and in all probability does, happen anywhere in the city of New Orleans.
One of the points stressed by counsel for petitioners is that various pictures, introduced in evidence and taken six weeks after the closing of the track during its last season before the trial, show several piles of refuse remaining in the track area. The record clearly establishes that these were the result of the use of the track by a charity horse show several weeks after the track had closed and had no connection at all with the usual track operation.
Although the record contains no reasons for judgment, of necessity the trial court must have concluded that petitioners failed to prove the existence of a nuisance in fact. We are unable to say that this finding of fact is erroneous.
For the reasons assigned the judgment appealed from is affirmed.
Affirmed.