337 So.2d 553 (1976)
Joe BONOMO and Maurice Glorioso, Plaintiffs-Appellants,
v.
LOUISIANA DOWNS, INC., et al., Defendants-Appellees.
Nos. 12964, 12965.
Court of Appeal of Louisiana, Second Circuit.
August 31, 1976.
Rehearing Denied September 27, 1976.
*554 Gamm, Greenburg & Kaplan, by Jack H. Kaplan, Shreveport, for plaintiffs-appellants.
John E. Jackson, Jr., Asst. Atty. Gen., New Orleans, for La. State Racing Commission, defendant-appellee.
Lunn, Irion, Switzer, Johnson & Salley, by Charles W. Salley, Shreveport, for Louisiana Downs, Inc., defendant-appellee.
Smith & LaGrone by Dewey J. Smith, and Bodenheimer, Jones, Klotz & Simmons by G. M. Bodenheimer, Jr., Shreveport, for Southern Research, Inc., defendant-appellee.
Before HALL, MARVIN and JONES, JJ.
En Banc. Rehearing Denied September 27, 1976.
MARVIN, Judge.
The issue in these consolidated cases is whether persons who have been convicted of the crime of bookmaking may be barred *555 from attending horse races at a race track operating under license of the Louisiana State Racing Commission. As did the lower court, we answer affirmatively.
In 1974, Joe Bonomo and Maurice Glorioso of Bossier City pleaded guilty and were sentenced by the U. S. District Court in Shreveport for the crime of conspiracy to commit illegal gambling, bookmaking on football games (18 U.S.C. § 1955).
In January, 1975, private security officials at the track (Louisiana Downs) told Bonomo and Glorioso they were not welcome and caused them to leave the track. In August, 1975, a successor private security agency (Southern Research, Inc.) for Louisiana Downs informed Glorioso at its Shreveport offices that he and Bonomo would not be allowed to attend races during the forthcoming racing season. In both instances the reason given for the barring was the bookmaking conviction.
Shortly after the August, 1975, incident, Bonomo and Glorioso filed separate suits against (1) the race track (Louisiana Downs, Inc.); (2) the private security company (Southern Research, Inc.); and (3) the Louisiana State Racing Commission. Each petitioner sought to enjoin his being barred from the track and sought damages under the federal civil rights law (42 U.S.C. § 2000a, et seq.) and under Art. 1, Section 12, Louisiana Constitution 1974.[1]
After the suits were filed but before trial, the stewards of the track[2] on December 5, 1975, informed Bonomo and Glorioso of a hearing at which time the stewards would consider a formal order of ejection against them under R.S.4:172(D) because of "your present convictions in federal court and your previous criminal record." After obtaining a brief delay, counsel for Bonomo and Glorioso informed the stewards by letter that inasmuch as suits had been filed and that "exhaustion of state legal or equitable remedies is not necessary to an action under the Civil Rights Act . . .," Bonomo and Glorioso would not attend the hearing. The hearing was held and the stewards formally barred Bonomo and Glorioso from the track and notified them in writing of the stewards' action.
Defendants excepted to the petitions under several labels (prematurity, jurisdiction, no cause and no right of action), the primary thrust of which was that petitioners had not exhausted the administrative remedies available to them under Title 4 (governing racing) and under R.S. 49:951, et seq. (the Administrative Procedure Act, especially applicable by reason of R.S. 4:154).
The cases were consolidated below and were heard in the district court two days after the stewards held their hearing. The lower court referred all exceptions to the merits and eventually rejected the demands of Bonomo and Glorioso.
Expert testimony established that bookmaking is an element of organized crime; that it saps the ability of a race track to *556 successfully operate and to maintain public confidence; that bookmaking siphons away revenues from the pari-mutuel betting pool, various amounts and percentages of which are statutorily dedicated to a number of worthy public purposes; that funds derived from bookmaking are not reported as income and produce no revenues for services to our citizens; and that bookmaking, especially on race track premises where the bookmaker is accompanied by his own customers, is almost impossible to detect and police.
Horse racing in Louisiana is regulated by law (Act 276 of 1940 as amended, now R.S. 4:141, et seq.). The Legislature has delegated authority to the Louisiana State Racing Commission to adopt uniform rules and regulations for the "holding, conducting and operating of all race tracks, race meets and races held in Louisiana . . ." R.S. 4:147(6). This delegation of authority was generally upheld in Dudoussat v. Louisiana State Racing Commission, 133 So.2d 155 (La.App. 4th Cir. 1961). See also 18 La.L.R. 79.
Part I of Title 4 of the Revised Statutes (Horse Racing), contains many expressions of State policy. Section 141 states in part:
"It is the policy of the State of Louisiana in furtherance of its responsibility to provide revenues for the operation of state government for its people, to encourage forceful and honest state-wide control of horse racing for the public health, safety and welfare by safeguarding the people of this state against corrupt, incompetent, dishonest and unprincipled horse racing practices."
Racing Commission members are required to be persons of "good moral character" (Section 144). The commission is authorized to make rules, regulations and conditions for the operation of race tracks and providing against "conduct detrimental to the best interest of racing" (Section 148(A)(53)) and to suspend the license of anyone who violates any rule or condition of the commission "... when the violation is detrimental to the state's interest in the regulation of horse racing ..." (148(B)). In this same paragraph the Legislature has declared two instances by way of illustration, which are detrimental to the state's interest. They are: "(1) not properly policing the grounds; and (2) violations which will unjustly deprive the state of revenue."
Section 149 limits wagering on horse races to "pari-mutuel wagering . . . within the race meeting grounds" and further declares:
". . . All other forms of wagering on the result of horse races are illegal, and all wagering on horse races outside the enclosure where horse races have been licensed by the commission is illegal."
Section 150 concerns the granting, refusing, suspending and withdrawing of licenses to "anyone," involved in racing operations, with the provision that "... no license shall be revoked without just cause." Under this section an applicant for a license is required to be "... of good character and reputation ... [who] has not ... knowingly associated ... with any ... persons who have been convicted of a felony ... or ... with bookmakers, touts, or persons of similar pursuits ..."
Among the duties imposed on stewards in the daily conduct of races is the duty to ". . . order ejected from the grounds . . . any improper or objectionable persons." Section 172(D).
The Rules of Racing adopted by the Racing Commission provide in part in its preface:
"No sport is more closely supervised than the racing of thoroughbred horses and quarter horses. The main purposes of this close supervision are to assure the spectator public and competing owners of horses:
"1. That the association conducting a race meeting is operated by responsible management; * * *"
The Rules generally track the legislative policy contained in R.S. Title 4 and provide that "any person making a handbook or *557 betting with a handbook shall be ejected from the grounds and denied any further admission." Rule 20 (w-1). This Rule also prohibits ". . . petty games of chance" on the grounds of the track. The Louisiana State Racing Commission in the Preface and Foreword of its Rules of Racing declares itself to be a member of the National Association of State Racing Commissions and bound by the constitution and by-laws of the national organization.
It is not contended here and no evidence was introduced to show that Bonomo and Glorioso were guilty of any violation of rules against illegal wagering while on the track premises during the January, 1975, incident. It is shown here that it is the policy of Louisiana Downs, Inc. and other race tracks across the nation to bar from attendance those persons known to be or who have been convicted of bookmaking. Indeed some states, unlike Louisiana, make it a crime for a person who has been convicted of bookmaking to be present in any area where pari-mutuel wagering is conducted. See People v. Licata, 28 N.Y.2d 113, 320 N.Y.S.2d 53, 54, 268 N.E.2d 787, 788 (1971) and Flores v. Los Angeles Turf Club, Inc., 55 Cal.2d 736, 13 Cal.Rptr. 201, 202, 361 P.2d 921, 922 (1961).[3]
The contentions of Bonomo and Glorioso on appeal may be generally summarized:
(1) Defendants' actions in barring them from the track violates 42 U.S.C. § 2000a(a), the 14th Amendment of the federal constitution, and Art. 1, Section 12 of the Louisiana Constitution;
(2) R.S. 4:172(D) and Rule 40(a) of the Rules of Racing adopted by the Louisiana State Racing Commission are unconstitutionally vague and indefinite; and
(3) Administrative remedies need not be exhausted before courts take jurisdiction where civil rights violations are alleged.
While these contentions are made against all defendants, the first contention relates primarily to the action of the track and its security arm in barring Bonomo and Glorioso before they filed suit. The second and third contentions relate primarily to the action of the stewards in formally barring Bonomo and Glorioso after the suits were filed in a hearing which they determined not to attend, apparently on advice of counsel.

THE CIVIL RIGHTS ISSUE
Applicable jurisprudential principles, whether derived from the state constitution, the federal constitutions or from the federal civil rights law are well established and are essentially the same. No person shall be denied access to or enjoyment of public facilities or accommodations because of that person's race, color, religion or national ancestry. It is conceded by defendants that the defendant race track is a place of public accommodation under the Civil Rights Law (See Miller v. Amusement Enterprises, Inc., 394 F.2d 342 (C.A. 5th La. 1968)).
The federal and state authorities prohibit any discrimination based on race, religion or national ancestry. They do not prohibit discrimination based on other reasons which are not arbitrary, capricious, or unreasonable, or which are not applied in that fashion, under particular circumstances which may be in question.
The Louisiana Constitution (1974) recognizes that discrimination based on "age, sex or physical condition" which is not "arbitrary, capricious or unreasonable" may lawfully exist. See Art. 1, Section 12. Examples which immediately come to mind as a reasonable discrimination (1) based on sex is the civilized custom and practice, at least in this nation, of having separate restrooms in public places for men and women (2) based on age is the practice of excluding persons *558 below or above particular ages from riding upon thrill rides in amusement parks and (3) based on physical condition is the practice of requiring participants in other public amusement or accommodation functions to be of minimum (or maximum) heights, weights and to be free of debilitating ailments such as cardiovascular diseases. See also our opinion of this date, In re Geiger, 337 So.2d 549 (La.App.2d Cir. 1976), upholding as not unreasonable, hair length and moustache regulations of the Shreveport Fire Department.
The barring of convicted bookmakers from a race track is not discrimination based on race, religion or national ancestry which is proscribed by the authorities mentioned. Plaintiffs concede that they were not barred on any of these grounds. Thus we are to determine whether the barring of plaintiffs from Louisiana Downs under the circumstances mentioned, constitutes unreasonable, or arbitrary discrimination on other accounts. See Annotation, "Exclusion of Person (for reason other than color or race) from place of Public Entertainment," 1 A.L.R.2d 1165. See also In re Cox, 3 Cal.3d 205, 90 Cal.Rptr. 24, 474 P.2d 992 (1970).
The exclusion of convicted felons such as Bonomo and Glorioso, or even known bookmakers, from race tracks has been upheld in most states where racing is legal. The Supreme Court of our sister state has correctly stated the controlling rules of law in this area as ". . . firmly settled by many decisions in many jurisdictions. The proprietor of a privately owned . . . race track . . . is not under a common carrier's duty to render service to everyone who seeks it. It is uniformly held that the proprietor may refuse to admit, or may eject from his premises [undesirable persons] . . ." See Griffin v. Southland Racing Corporation, 236 Ark. 872, 370 S.W.2d 429, 430 (1963) and cases cited in 1 A.L.R.2d 1165, as supplemented, from New York, New Jersey, California and other states. The basis for excluding persons of a particular category from a business open to the public (other than because or race, religion or national ancestry) is done at the proprietor's risk, and must be done for a purpose which is reasonable and not contrary to public policy or constitutional principles.
The purpose to be achieved by barring convicted bookmakers from a race track is to maintain the public's confidence in horse racing and pari-mutuel betting. This purpose is reasonable. It is not against public policy or constitutional principles.
In People v. Licata, 28 N.Y.2d 113, 320 N.Y.S.2d 53, 55, 268 N.E.2d 787, 788 (1971), where a convicted bookmaker was barred from Aqueduct Race Track, the court said:
"The rule is well established that the operator of a race track can `exclude a person from attending its races * * * as long as the exclusion is not founded on race, creed, color or national origin.' * * * Moreover, the rules and regulations of the New York State Racing Commission specifically provide: `[Undesirable persons to be ejected] No person who is known or reputed to be a bookmaker or a vagrant within the meaning of the statutes of the State of New York, * * * shall enter or remain upon the premises of any licensed association conducting a race meeting under the jurisdiction of the commission; and all such persons shall upon discovery or recognition be forthwith ejected * * *' The regulation imposes upon the licensed association the burden of carefully screening its patrons, and excluding or expelling any undesirable persons." (Emphasis supplied).
While Louisiana is not as explicit as New York in making it a crime for a bookmaker to enter a race track, the public policy of Louisiana is to the same effect as the policy of New York. See our comments on Title 4 of the Revised statutes, supra. The exclusion of convicted bookmakers from a race track is in keeping with the public policy of this state. Louisiana Downs, through its security agency (Southern Research) in this instance, did not unreasonably discriminate against plaintiffs. Plaintiffs do complain that other bookmakers known to them who have not been convicted of the crime, have *559 been seen at the track from which they were excluded. The record shows that Louisiana Downs has barred other convicted bookmakers and that its policy in this respect is uniform and not unreasonably discriminatory against plaintiffs. While R.S. Title 4 and the Rules of Racing adopted by the Racing Commission could be much more explicit, their letter, spirit and policy impose upon Louisiana Downs, Inc., as a race track operator, a general duty to exclude convicted bookmakers from the race track and pari-mutuel premises because their exclusion is in the interest of racing and the state's interest in racing.

THE ISSUES ARISING FROM THE STEWARDS' ACTION
Plaintiffs' primary contention here is that the term "improper and objectionable persons" in R.S. 4:172(D) and Rule 40(a) of the Rules of Racing is unconstitutionally vague and indefinite. There is a distinction in construing civil statutes where admittedly vague words are employed and where no criminal penalty is imposed (with terms such as just cause, good moral character, financial ability) from criminal statutes. See Annotation of U.S. Supreme Court cases on this subject, 40 L.Ed.2d 823 (1975).
On the basis of the evidence and our analysis of R.S. Title 4, made supra, we can and do deduce that the term improper and objectionable person has acquired a definite and recognized meaning within thoroughbred racing associations and state racing commissions who are affiliated with the National Association of State Racing Commissioners and that within the accepted meaning of the term is a person who has been convicted of bookmaking. We need not, however, conclude with this finding, because plaintiffs' contentions regarding the action of the stewards can and should be resolved against plaintiffs because they did not exhaust administrative remedies which were available to them.
Federal cases which accept jurisdiction notwithstanding available administrative remedies, do so because of alleged arbitrary and unreasonable discrimination in violation of the 14th Amendment and the federal Civil Rights Law. See Salkay v. Williams, 445 F.2d 599 (C.A. 5th Fla.1971). In the instant case, after a hearing below, we have initially held that the proprietor of a race track is not in violation of the anti-discrimination provisions of the state or federal constitutions or the Civil Rights Law by barring convicted bookmakers from attending horse races.
We are concerned then, not with alleged discrimination under state or federal law, but with plaintiffs' contentions as to indefiniteness of the state racing law and rules adopted thereunder by the Commission and the authority of the stewards generally, and specifically the stewards' exercise of authority in this instance. The stewards' action occurred after suit was filed and was based on Bonomo and Glorioso being improper and objectionable persons under R.S. 4:172(D) and Rule 40(a) of the Commission's Rules of Racing.
The stewards' action, after the hearing which plaintiffs elected not to attend, was appealable to the Racing Commission.[4] Plaintiffs did not appeal the stewards' decision to the Commission (or failed to timely appeal as plaintiffs themselves contend in appellate briefs) and the Commission did not have the opportunity to decide whether convicted bookmakers were objectionable and improper persons within the meaning of its rules. The Commission did not have the opportunity to decide whether two of *560 the three stewards at Louisiana Downs could conduct a hearing as plaintiffs complain they did. The Racing Commission is superior to the stewards and is empowered to correct errors of the stewards. If the stewards were in error, the Racing Commission was afforded no opportunity to correct them. The appeal from action or a decision of the stewards lies not to the courts, but to the Racing Commission.
R.S. 49:963, 964 provide for judicial review of the Commission's actions. Courts are empowered to reverse or modify the Commission's adjudication only for stated reasons:
"* * * G. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon lawful procedure;
(4) Affected by other error of law;
(5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(6) Manifestly erroneous in view of the reliable, probative, and substantial evidence on the whole record. In the application of the rule, where the agency has the opportunity to judge of the credibility of witnesses by firsthand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the agency's determination of credibility issues. Acts 1966, No. 382, § 14, eff. July 1, 1967."
In McKart v. United States, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969), the United States Supreme Court said:
"The doctrine of exhaustion of administrative remedies is well established in the jurisprudence of administrative law. See generally 3 K. Davis, Administrative Law Treatise § 20.01 et seq. (1958 ed., 1965 Supp.); L. Jaffe, Judicial Control of Administrative Action 424-458 (1965). The doctrine provides `that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.' Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938). The doctrine is applied in a number of different situations and is, like most judicial doctrines, subject to numerous exceptions. Application of the doctrine to specific cases requires an understanding of its purposes and of the particular administrative scheme involved."
The "understanding" of the doctrine, to use McKart terminology was summarized in Ecology Center of Louisiana, Inc. v. Coleman, 515 F.2d 860, 865-866 (C.A. 5th La. 1975):
"Moreover, we note that the doctrine of administrative exhaustion is not a strict jurisdictional matter but a flexible concept tailored to the administrative statutes and circumstances . . . It does dictate a balancing of interests in which the previous availability of a corrective administrative procedure weighs heavily. The criteria used in the balancing process were explicated in McKart, supra, and they include the following factors: 1) how harsh is the penalty that plaintiff will suffer if barred from asserting his claims in court; 2) even if the penalty is not overwhelmingly harsh, will allowing a by-pass of administrative procedure seriously impair the ability of the agency to perform its functions; 3) does the issue upon which the decision turns involve matters of particular agency expertise; (4) would judicial review be significantly aided by an additional administrative decision, through allowing the agency to make a factual record, apply its expertise or exercise, its discretion; 5) how likely is it that the judiciary will be overburdened with suits stemming from the same administrative failure when such suits might have been resolved through the administrative process; and 6) how significant *561 is the role of administrative autonomythe notion that the courts should not usurp powers and duties entrusted to the agency, and the related notion that `the agency [ought to] be given a chance to discover and correct its own errors'?"
See also O'Meara v. Union Oil Co. of California, 212 La. 745, 33 So.2d 506 (1947); State Board of Education v. Anthony, 289 So.2d 279 (La.App. 1st Cir. 1974), writs refused, La., 292 So.2d 246; and Bagert v. Moreau, 325 So.2d 702 (La.App. 4th Cir. 1976).
In view of our holding that Louisiana Downs may exclude Bonomo and Glorioso, as convicted bookmakers from the race trace in the first instance, we find no "harsh penalty" factor or other McKart factors which will warrant our concluding that Bonomo and Glorioso should not be required to exercise available administrative remedies before complaining to a Louisiana court about the actions of Louisiana Racing stewards. The trial court was correct in rejecting plaintiffs' demands even as against the Louisiana Racing Commission on this basis.
At appellants' cost, the judgment in each consolidated case is
AFFIRMED.
NOTES
[1] 42 U.S.C. § 2000a(a) provides that all persons shall be entitled to enjoy any place of public accommodation ". . . without discrimination or segregation on the ground of race, color, religion or national origin."

Art. 1, Section 12 of the Louisiana Constitution provides that in access to public facilities, every person shall be free from discrimination based on ". . . race, religion or national ancestry, and from arbitrary, capricious or unreasonable discrimination based on age, sex or physical condition."
[2] R.S. 4:147 provides that the racing commission shall name three stewards who shall have supervision of the daily conduct of racing.

R.S. 4:172 provides in part:
"A. . . . The stewards have full authority to investigate, inspect, search and inquire into all matters under their supervision.
"B. Should any case occur which may not be covered herein or by the Rules of Racing, it shall be determined by the commission and implemented by the stewards but only insofar as such determination is consistent with justice, the best interest of racing and with powers and authority herein granted; . . .
* * * * * *
"D. The stewards shall order ejected from the grounds of the association any improper or objectionable persons.
* * * * * *
"Q. In addition to the above, the stewards shall have those authorities, powers and duties as are prescribed and conferred by the commission not inconsistent with this Part, including by way of illustration those provided by the rules of racing."
(Emphasis ours)
[3] Art. 103.1(A)(4), La.Cr.C., provides that a person may be guilty of the crime of disturbing the peace when he "refuses to leave the premises of another when requested to do so by any owner, lessee, or any employee thereof. . ." In the absence of a refusal to leave the race track premises when requested to do so by track officials, a bookmaker has not violated any provision of Title 4 or of the Criminal Code which would impose criminal sanctions on him.
[4] R.S. 4:156 reads in part:

"A. A final appeal, in the case of any person penalized, or disciplined by the stewards, may be taken to the commission.
"B. Such an appeal must be filed in writing at the office of the commission within five days of the date of said penalty or imposition of said discipline. * * *
"D. An appeal from the decision of the stewards to the commission shall not affect such decision until the appeal has been acted upon by the commission. * * *"
R.S. 4:154 provides:
"The commission's hearings, practice and procedure and rule making procedure are as provided in Title 49, Chapter 13, Administrative Procedure, R.S. 49:951 et seq."