560 So.2d 812 (1990)
Kathy B. Abate, Wife of/and Charles V. ABATE, Jr.
v.
HEALTHCARE INTERNATIONAL, INC., Alpha Stress Care, Inc., and Ali A. Salehi, M.D.
Joe REED, Husband of/and Dorothy Reed
v.
ST. CHARLES GENERAL HOSPITAL, the Blood Center for Southeast Louisiana, Inc. and Drs. Treuting, Simpson, and the Pathology Laboratory.
Nos. 89-CC-2737, 89-CC-2748.
Supreme Court of Louisiana.
April 30, 1990.
Rehearing Denied May 24, 1990.
C. Scott Carter, New Orleans, for applicants Kathy and Charles Abate.
Albert H. Hanemann, Jr., Susan C. Northrop, Lemle & Kelleher, Kurt Blankenship, Lanny Zatzkis, New Orleans, William J. Guste, Jr., Atty. Gen., for respondents Healthcare Intern., Inc., Alpha Stress Care, Inc., and Ali Salehi.
Russ Herman, Mark R. Wolfe, Herman Herman Katz & Cotlar, New Orleans, for applicants Joe and Dorothy Reed.
Edward Rodrigue, Jr., Terry Deffes, Boggs, Loehn & Rodrigue, New Orleans, Leo R. Hemelt, II, Windhorst, Gaudry, Talley & Ransom, Harvey, Robert Young, Jr., Young, Richaud, Theard & Myers, New Orleans, for respondents St. Charles Gen. Hosp., the Blood Center for Southeast La., Inc., and Drs. Treuting, Simpson and the Pathology Lab.
*813 COLE, Justice.[*]
The issue is whether a health care provider must "qualify" under the provisions of the Medical Malpractice Act, LSA-R.S. 40:1299.41 et seq., prior to the commission of the alleged tortious conduct in order for the conduct to be covered by the Act.
The defendants in the two cases consolidated for our review were not enrolled in the Patient Compensation Fund (PCF) when their alleged acts or omissions of medical malpractice occurred. However, defendants "qualified" as health care providers (QHCP) under the provisions of the Medical Malpractice Act (Act) prior to the dates plaintiffs filed their respective suits 1) by filing proof of their financial responsibility with the Commissioner of Insurance and 2) by payment of the surcharge assessed by the PCF. LSA-R.S. 40:1299.42(A), (E).[1] The insurance policies defendants filed to establish their financial responsibility were "claims-made" policies with coverage which retroactively encompassed the dates of defendants' alleged tortious acts or omissions.
Both sets of plaintiffs filed their suits against the QHCPs without first presenting their claims to medical review panels as required by the Act. LSA-R.S. 40:1299.47. As a consequence, defendants filed dilatory exceptions objecting to the prematurity of the suits. Interpreting Act 435 of 1984, which amended LSA-R.S. 40:1299.42(E),[2] as providing QHCPs with PCF coverage which is coextensive with their primary policies of malpractice liability insurance, both trial courts considered defendants' alleged tortious acts or omissions covered by the provisions of the Act. Defendants' dilatory exceptions were, therefore, maintained and plaintiffs' suits dismissed. The courts of appeal denied both plaintiffs' applications for supervisory relief. We granted writ to examine whether defendants' exceptions were properly maintained. Finding the Act does not provide coverage to health care providers who fail to qualify prior to the commission of the tortious conduct, we reverse and remand.

POSTURE OF THE CASE
A. The Abates
Kathy B. and Charles V. Abate, Jr., filed suit on April 16, 1987, naming as defendants Bonnabel Hospital; Alpha Stress Care, Inc. and Dr. Ali A. Salehi, M.D., a specialist in radiology. Amending and supplemental petitions added as defendants Philip V. Bellina, Jr., M.D. (a professional medical corporation) and defendants' insurers.[3] The original and amending petitions claim defendants are solidarily and jointly liable for "negligently and/or carelessly fail[ing] to properly care for, treat, supervise, test and monitor Mrs. Abate while she was hospitalized in Bonnabel Hospital" from February 16, 1986 until April 4, 1986. The petitions further allege the defendants' "failure to recognize and properly treat Mrs. Abate's ailment or condition allowed significant spread of infection, destruction of tissues, and medical complications." As a result of these alleged acts of negligence, plaintiffs claim Mrs. Abate has undergone fifteen to twenty surgical procedures and has amassed medical bills totaling approximately $1.5 million dollars.
In response, on September 19, 1988, Dr. Salehi filed a dilatory exception objecting to the prematurity of the suit. He claims that at all times pertinent to the lawsuit he has been a QHCP pursuant to the provisions of the Medical Malpractice Act, LSA-R.S. 40:1299.41 et seq. Accordingly, he asserts his entitlement to having plaintiffs' claim submitted to a medical review panel as a condition precedent to suit. LSA-R.S. 40:1299.47. He claims the rights and privileges afforded to QHCP because 1) his surcharge was paid to the PCF on July 28, *814 1986, before plaintiffs' filed their claim, and 2) his proof of financial responsibility is established by a "claims-made" malpractice liability insurance policy with a policy term effective August 15, 1986, expiring on August 15, 1987, but with retroactive coverage to August 15, 1985. Dr. Salehi asserts that according to Act 435 of 1984, "qualification" under the Medical Malpractice Act takes effect, covers the same time and provides identical coverage to the QHCP's primary policy of malpractice liability insurance.[4]
As Dr. Salehi was not "qualified" as a health care provider when the alleged tortious conduct occurred, the Abates' opposition to the exception declares the Act does not cover their claim. LSA-R.S. 40:1299.41(D).[5] The Abates contend "qualification" under the Act requires filing proof of financial responsibility and payment of the surcharge levied by the PCF prior to the commission of the tort. LSA-R.S. 40:1299.42(A); 40:1299.41(D). To support their position, the Abates cite Williams v. St. Paul Ins. Co., 419 So.2d 1302 (La.App. 4th Cir. 1982), writ den., 423 So.2d 1182 (La.1982), and Mehalik v. Morvant, 451 So.2d 1321 (La.App. 1st Cir. 1984), as dispositively holding, for the tortious conduct to be covered by the Act, the initial surcharge had to be paid by the health care provider before the tortious conduct occurred. LSA-R.S. 40:1299.42(A).
The Abates also produced Dr. Salehi's deposition testimony which reveals he specifically rejected PCF coverage for the policy period of August, 1985 through August, 1986, the period in which Mrs. Abate was hospitalized at Bonnabel Hospital. Their supplemental memoranda and exhibits reveal Dr. Salehi's insurance agents confirm he rejected the PCF coverage for the effective period covering Mrs. Abate's hospital stay, with full knowledge that, without the PCF endorsement, malpractice claims against him would not be limited to $500,000 and he would not be entitled to PCF privileges such as preliminary review of claims against him by a panel of his peers.[6]
To refute this opposition, Dr. Salehi cites James Keating, M.D. v. Sherman Bernard, Commissioner of Insurance and Administrator of the Louisiana Patient's Compensation Fund, No. 315-915, 24th J.D.C. and Timothy Rochester, et al. v. St. Paul Fire and Marine Insurance Company, No. 311,547, 19th J.D.C., as holding Williams and Mehalik had been legislatively overruled by LSA-R.S. 40:1299.42(E), as amended by Act 435 of 1984. Dr. Salehi claims the Keating and Rochester courts interpreted the 1984 legislation as providing QHCPs with coverage under the Act if the health care provider is "qualified" when the claim is filed and the QHCP's "claims-made" insurance policy provides coverage or retroactive coverage of the claims. The Abates countered these assertions by claiming the legislative history of the 1984 amendment does not indicate the intent to legislatively overrule Williams and Mehalik. Furthermore, as the legislature did not amend LSA-R.S. 40:1299.42(A), which contains the requirements for "qualification" under the Act, the Abates argue Williams and Mehalik are controlling interpretive decisions and the Keating and Rochester district courts erred by not following their direction. In the alternative, the Abates claim LSA-R.S. 40:1299.42(E), as amended, is unconstitutional because it *815 violates vested property rights in their cause of action and it violates the constitutional protection against "special laws". LSA-Const. Art. 1, § 2; Art. 1, § 3; Art. 1, § 22; Art. 3, § 12(A).
Hearings on the exception were held on February 14, 1989 and May 24, 1989. Judgment was rendered on September 6, 1989. Dr. Salehi's exception was maintained and the Abates' petition was dismissed without prejudice. Written reasons state the court found Rochester persuasive and determined Act 435 of 1984, as it amended LSA-R.S. 40:1299.42(E), allows the Medical Malpractice Act to cover plaintiffs' claim against Dr. Salehi. The court also found plaintiffs failed to establish the unconstitutionality of Subsection E. Thereafter, the Abates applied to the Fifth Circuit for supervisory relief. The court of appeal declined to exercise its supervisory jurisdiction.
B. The Reeds
Joe Reed underwent back surgery on March 12, 1985 at St. Charles General Hospital. During the operation, he received blood transfusions. On September 29, 1987 he was diagnosed as having contracted the AIDS virus. His wife, Dorothy, was similarly diagnosed on December 11, 1987. He died as a result of AIDS-related complications on November 12, 1988.
The Reeds filed suit on September 14, 1988, naming as defendants St. Charles General Hospital[7] and the Blood Center for Southeast Louisiana, claiming defendants are solidarily liable in negligence and strict liability for "fail[ing] to provide adequate warning, instruction, directions, testing and updates as with regard to blood products distributed, advertised, sold and warehoused by them ..." On March 9, 1989, the Pathology Laboratory, Robert E. Treuting, M.D., and M.G. Simpson, M.D., were added as defendants.[8] The amended petition claims these defendants are solidarily liable with the original defendants as distributors and vendors of blood products. It also claims all defendants "knew or should have known of the defects of their products, inadequacies in their products and further failed to properly and adequately warn physicians and lay-people regarding its use and instruction." The petition asserts Joe Reed "would not have used these products nor would he have consented to their use, had he been properly warned of risks and defects inherent in the product and warning and testing procedures or the failure to use proper tests." Had Mr. Reed been properly warned, the petition claims he would have used blood donated from friends and relatives.
In reaction to being named as defendants in the suit, Drs. Treuting and Simpson and the Pathology Lab objected to the prematurity of the lawsuit because the Reed's claim had not been reviewed by a medical panel. To factually support their dilatory exception, defendants introduced their proof of payment of the surcharge and enrollment into the PCF on August 1, 1986, prior to when the Reed's claim was filed.[9] And, they introduced the "claims-made" *816 malpractice liability insurance policies with terms effective August 1, 1986, expiring on August 1, 1987 (renewed through October 1, 1988), which provided retroactive coverage from August 1, 1975.[10] As authority for their argument that this proof entitles them to PCF coverage of the Reed's claim, defendants' brief cites Rochester and Mirtha L. Ferrer v. Frank J. Bertucci, M.D., et al., No. 89-C-0697 (La.App. 4th Cir., May 30, 1989) [granted the health care provider's application for superviory relief and granted his dilatory exception based upon LSA-R.S. 40:1299.42(E), as amended by Act 435 of 1984]. Defendants assert that in Ferrer, the Fourth Circuit's order adopts the position that a "claims-made" insurance policy can entitle the QHCP to PCF coverage predating the PCF qualification. See Op.Atty.Gen., No. 88-211, August 4, 1988.
In opposition, Mrs. Reed claims she possesses a property right in the cause of action which vested when the tort was committed, citing Marcel v. Louisiana State Dept. of Pub. Health, 492 So.2d 103 (La. App. 1st Cir.1986), writ den., 494 So.2d 334 (La. 1986). As the state may not retroactively deprive her of a vested property right through the enactment of an ex post facto law, she argues a physician should not be able to do so by private contract. She asserts it is unreasonable to provide PCF coverage to health care providers for periods when they had not contributed to the Fund. And she asserts the unjustness of allowing a tortfeasor to limit his liability for damages by an after-the-fact purchase of a policy of insurance. She claims that if LSA-R.S. 40:1299.42(E) allows such an anomalous result, then the provision is unconstitutional.
The exception was heard on May 26, 1989 and taken under advisement. On July 14, 1989, the trial court upheld the constitutionality of LSA-R.S. 40:1299.42(E), maintained defendants' exception and dismissed plaintiff's case without prejudice. Mrs. Reed sought supervisory relief from the Fourth Circuit, but it was denied.
On the plaintiffs' separate applications for certiorari, we granted writ and ordered the cases consolidated. 556 So.2d 21 (La. 1990); 556 So.2d 27 (La. 1990).

LAW AND ARGUMENTS
LSA-R.S. 40:1299.42(A) contains the following language:
§ 1299.42. Limitation of recovery
A. To be qualified under the provisions of this Part [Part XXIII. Medical Malpractice Act], a health care provider shall:
(1) Cause to be filed with the commissioner proof of financial responsibility as provided by Subsection E of this Section;

(2) Pay the surcharge assessed by this Part on all health care providers according to R.S. 40:1299.44; and
(3) For self-insureds, qualification shall be effective upon acceptance of proof of financial responsibility by and payment of the surcharge to the commissioner of insurance. Qualification shall be effective for all others at the time the malpractice insurer accepts payment of the surcharge. (emphasis added)
Thus, to qualify, a health care provider must file the type of proof of financial responsibility described in Subsection E and pay the annual PCF surcharge levied on the health care provider according to Section 1299.44.[11] For self-insureds, qualification under the Medical Malpractice Act shall then be effective upon the commissioner's acceptance of the proof of financial responsibility and his receipt of payment of the surcharge. For health care providers other than self-insureds, qualification under the Medical Malpractice Act shall be effective "at the time the malpractice insurer *817 accepts payment of the surcharge." § 1299.42(A)(3).
For amplification on the proof of financial responsibility a health care provider must file with the commissioner in order to qualify under the Medical Malpractice Act, Subsection A(1) references Subsection E. That Subsection then describes the proof as follows:
E. Financial responsibility of a health care provider under this Section [§ 40:1299.42. Limitation of recovery] may be established only by filing with the commissioner proof that the health care provider is insured by a policy of malpractice liability insurance in the amount of at least one hundred thousand dollars per claim with qualification under this Section taking effect and covering the same period and following the same form as the policy of malpractice liability insurance of the health care provider or, in the event the health care provider is self-insured, proof of fianancial responsibility in excess of one hundred thousand dollars. LSA-R.S. 40:1299.42(E). (emphasis added)
By its clear language, Subsection E describes the exclusive methods by which the health care provider's financial responsibility may be established. Cf. LSA-C.C. art. 11. The use of the term "Section" in Subsection E, instead of the term "Part", clarifies that the Subsection is used merely as a descriptive statement, a means of expressing what is denoted by the phrase "proof of financial responsibility".
Subsection E merely sets forth the requirements needed to satisfy Subsection A(1). When Act 435 of 1984 added the phrase "with qualification under this Section taking effect and covering the same period and following the same form as the policy of malpractice liability insurance of the health care provider," the amending language did not alter or modify the dictates of Subsection A(3). Qualification under the Medical Malpractice Act for health care providers other than self-insureds continues to be effective at the time the malpractice insurer accepts payment of the (initial PCF) surcharge. Subsection E, as amended, alerts those health care providers their proof of financial responsibility and, hence, their qualification under § 1299.42, is effective only for "the same period and following the same form" as their filed policy of malpractice liability insurance. For example, if the health care provider pays the PCF surcharge for the period August 1, 1989 through August 1, 1990, but the claims-made malpractice liability insurance policy which he has caused to be filed with the commissioner becomes effective on September 1, 1989 but expires on January 1, 1990, Subsection E declares the health care provider has failed to establish proof of his financial responsibility for the entire period covered by the PCF surcharge. For the periods August 1, 1989 through August 31, 1989 and January 1, 1990 through August 1, 1990, the health care provider is not qualified, despite the payment of the PCF surcharge.
The 1984 amendment to Subsection E clarified that mere payment of the annual surcharge and filing a malpractice liability insurance policy which pays $100,000 per claim is insufficient for PCF coverage. Any lapse in the malpractice liability insurance policy filed as proof of financial responsibility, through either its effective period or its form (occurrence or claimsmade), renders the health care provider unqualified during the period of the lapse. Cf. LSA-R.S. 40:1299.45(A)(1); 40:1299.41(D).[12]
*818 Nevertheless, defendants' primary argument is the legislature amended Subsection E in 1984 in direct response to the decisions of Williams and Mehalik. Defendants claim those two decisions rely upon the language of Subsection A as their sole basis for holding, where health care providers have not paid the PCF surcharge prior to the occurrence of the alleged tort, the tortious conduct is not covered by the Act and plaintiffs can file suit under general tort law and procedure. Thus, by its amendment of Subsection E, defendants claim the legislature intended to change the law so Subsection A would govern only the method by which a health care provider becomes qualified, while the amended Subsection E would govern the period of coverage after the qualification has occurred. They assert this intent is evidenced by the legislature's passage of the amendment within weeks of the Fourth Circuit's decision in Mehalik. The history of Act 435 of 1984, however, does not accord with defendants' views.
Act 435 of 1984 was introduced in the legislature as Senate Bill No. 1110. The bill sought to amend numerous sections of the Medical Malpractice Act. After passage in the Senate it was amended by the House and returned to the Senate for concurrence in the amendments. Following enactment, it was presented to the Governor on July 5, 1984 for his signature.
The First Circuit had denied rehearing in Williams on October 22, 1982 and this court denied writs on December 20, 1982. No action was taken by the 1983 legislature in response to the Williams decision. Mehalik was not handed down by the Fourth Circuit until June 26, 1984, the day after the House had amended Senate Bill No. 1110 and returned it to the Senate for concurrence. This sequence of events does not, as defendants suggest, incontrovertibly evince a legislative intent to overrule Williams and Mehalik.
Defendants also contend Subsection E was amended to reflect the insurance industry's change to issuing as the standard policy "claims-made" policies, instead of "occurrence" policies. "Occurrence" policies insure only those claims which occur during the effective period of the policy. With those policies, coverage problems developed when the time of the negligent act could not be determined with exactitude. Defendants assert the industry's solution for the problem was to develop claimsmade policies which insure claims filed within the effective period of the policy as long as the claims arise from acts or omissions which occur during the policy's effective period or during the policy's specified retroactive period. This argument and its interpretation of Act 435, however, leads to absurd and possibly unconstitutional consequences.
The PCF is funded by surcharges levied annually upon the QHCPs. Under the theory propounded by defendants, a QHCP whose financial responsibility is established by a claims-made policy is given heightened treatment compared to other QHCPs. Unlike the self-insured QHCPs or the QHCPs with "occurrence" policies, under defendants' theory the "claims-made" QHCPs are entitled to PCF coverage for periods during which they had not paid or qualified, merely because their contract with a third-party insurer provides for retroactive coverage. This theory is repugnant to the interests of the fund as well as to tort victims who must rely upon the fund for compensation. It would expose the fund to tort claims arising from periods for which it had not received surcharge payments. It would also increase the possibilities of the fund being diminished or exhausted during the semi-annual period in which claims became final, resulting in claims of tort victims not being honored when they came due. See LSA-R.S. 40:1299.44.
Furthermore, even though it is our rule of long-standing to refrain from considering constitutional issues unless a determination is necessary for the resolution of the litigant's present rights, we observe that defendants' interpretation appears not to harmonize with our constitution. See Everett v. Goldman, 359 So.2d 1256 (La. 1978). *819 First, the 1984 amendment as defendants would interpret it, could violate malpractice victims' equal protection rights by allowing tortfeasors who have become potential malpractice defendants to control how they would be sued. See Id.[13] Second, because defendants' interpretation might make the 1984 amendment unreasonable in relation to the goal the Medical Malpractice Act seeks to attain and might show the amendment was not adopted in the interest of the community as a whole, such an interpretation suggests violation of the malpractice victims' due process rights. See Id.
Third, defendants' interpretation might violate the State constitutional proscription against special laws. LSA-Const. Art. 3, § 12(A)(7).[14] A statute is a special law if it affects only a certain number of persons within a class and not all persons possessing the characteristics of the class. Davenport v. Hardy, 349 So.2d 858 (La. 1977); Teachers' Retirement System of Louisiana v. Vial, 317 So.2d 179 (La.1975). Consequently, as defendants' interpretation does not operate equally and uniformly upon all QHCPs or on all tort victims of health care providers or of QHCPs, it might unconstitutionally allow certain health care provider tortfeasors to dictate how they would be sued.
Finally, defendants' interpretation, when combined with a claims-made policy with a retroactive date which covers periods prior to July 5, 1984 (the effective date of the 1984 amendment), may result in violation of the vested property rights of tort victims in contravention of their due process guaranties. See Faucheaux v. Alton Ochsner Medical Foundation Hospital and Clinic, 470 So.2d 878 (La.1985) [when plaintiff's injury happened, he acquired a cause of action in strict liability under LSA-C.C. art. 2315 which is a vested property right protected by the guarantee of due process]; Lott v. Haley, 370 So.2d 521 (La.1979); Burmaster v. Gravity Drainage District No. 2, 366 So.2d 1381 (La. 1978).
Thus, were Subsection E susceptible to the construction urged by defendants, constitutionality is suspect for several reasons. The interpretation we adopt in this opinion obviates a definitive ruling on the constitutionality of the amended subsection. This comports with our duty to interpret the statute so as to render it operative when it is possible to do so and avoid striking it on constitutional grounds. Tanner v. Beverly Country Club, 47 So.2d 905, 217 La. 1043 (1950); Conley v. City of Shreveport, 43 So.2d 223, 216 La. 78 (1949); State v. Wiggins, 438 So.2d 565 (La.1983) (Dennis, J. concurring); Dudoussat v. Louisiana State Racing Com'n, 133 So.2d 155 (La. App. 4th Cir. 1961). See also, Concerned Bus. & Prop. Owners of DeSoto, Inc. v. DeSoto Parish School Bd., 531 So.2d 436, 443 (La. 1988) [An unconstitutional act which purports to amend a prior constitutional statute cannot accomplish that objective. The unconstitutional act, having no effect, can amend nothing. Instead, the applicable law is provided by the statute as worded prior to the unconstitutional amendment.].

DEFENDANTS' DILATORY EXCEPTIONS
The Medical Malpractice Act provides no action against a QHCP or his insurer may be commenced in any court *820 before the claimant's proposed complaint has been presented to a medical review panel. LSA-R.S. 40:1299.47(B)(1)(a)(i). Accordingly, when the Reeds and the Abates filed their actions without first having submitted their proposed complaints to medical review panels pursuant to Section 1299.47, defendants filed dilatory exceptions objecting to the prematurity of the suits pending against them. LSA-C.C.P. art. 926. After hearings on the exceptions, the trial courts maintained the exceptions and dismissed plaintiffs' suits in accordance with LSA-C. C.P. art. 933. The trial courts had interpreted Act 435 of 1984, as it amended Section 1299.42(E), as providing QHCPs with PCF coverage coextensive with the malpractice liability insurance policies filed with the commissioner. Consequently, as the QHCPs have claims-made policies with retroactive coverage encompassing the periods from which the plaintiffs' claims arise, the courts determined the defendant QHCPs' tortious acts or omissions were covered by the provisions of the Act. The trial courts erred, however, by maintaining the exceptions because Subsection E describes only the methods by which the health care provider may establish proof of financial responsibility. Subsection A(3) continues to govern when a health care provider's qualification under the Act becomes effective.

DECREE
For the reasons assigned, the judgments of the trial courts are reversed. Defendants' dilatory exceptions raising the objection of prematurity are denied. Plaintiffs' suits against defendants are reinstated and remanded to the trial court for further proceedings. All costs are assessed against the respondent defendants.
REVERSED AND REMANDED.
LEMMON, J., concurs.
NOTES
[*] Judge Melvin A. Shortess of the Court of Appeal, First Circuit, participated in this decision as Associate Justice Pro Tempore.
[1] For the text of these provisions, see Law and Arguments section, infra.
[2] For the text of the portion of Act 435 of 1984 which amends subsection E, see Law and Arguments section, infra.
[3] As regards the Abates' claim, the only defendants pertinent to this writ application are Dr. Salehi and his insurer.
[4] The Commissioner of Insurance certified Dr. Salehi's enrollment period in the PCF as follows:

08/15-8608-15-87
08-15/8711-01-87
Furthermore, in response to an inquiry, Emery J. Bares, Deputy Commissioner, wrote:
* * * * * *
... Dr. Ali Salehi was covered by a St. Paul Fire and Marine "claims made" insurance policy at the time of the filing of the complaint. Since Dr. Salehi was insured at the time of the filing of the complaint, coverage should be afforded in accordance with the provisions of Act 817 of 1975, as amended, at LA R.S. 40:1299.41 et seq....
[5] For the text of this provision, see Law and Arguments section, infra.
[6] If Dr. Salehi would have become a QHCP, his PCF surcharge for the effective period covering Mrs. Abate's hospital stay would have been $1,462. St. Paul increased Dr. Salehi's premium only $415 when he rejected the PCF endorsement for the period which included her hospital stay.
[7] NME Hospitals, Inc. d/b/a St. Charles General Hospital was dismissed from this action by a consent judgment dated March 2, 1989 and by a second consent judgment dated April 11, 1989. The hospital was a QHCP, enrolled in the PCF as a self-insured health care provider since November 14, 1981.
[8] The first supplemental petition added Dorothy Reed's claim for the wrongful death of Joe Reed. The third supplemental and amending petition added St. Paul Fire and Marine Insurance Co., the insurer of Drs. Treuting, and Simpson and the Pathology Lab. As regards Dorothy Reed's claims, the only defendants pertinent to this opinion are Drs. Treuting and Simpson and the Pathology Lab and their insurer.
[9] In response to plaintiff's inquiry, Emery J. Bares, Deputy Commissioner, wrote:

* * * * * *
A review of the above referenced medical malpractice claim filed with this office reveals that the Pathology Lab, Dr. M.G. Simpson and Dr. Robert Treuting were covered by a St. Paul Fire & Marine "claims made" insurance policy at the time of the filing of the complaint.
Since the above named defendants were insured at the time of the filing of the complaint, coverage should be afforded in accordance with the provisions of Act 817, as amended, at LA R.S. 40:1299.41 et seq. ...
[10] Initially, the Pathology Lab had retroactive coverage only from February 1, 1981. However, the policies filed into the record show all three defendants might have limited their retroactive coverage to run from November 9, 1982, instead of February 1, 1981 and August 1, 1975.
[11] Section 1299.44 is captioned "Patient's compensation fund." Included in this Section are the provisions for determining the amount of the annual PCF surcharge.
[12] LSA-R.S. 40:1299.45(A)(1) provides:

Only while malpractice liability insurance remains in force, or in the case of a self-insured health care provider, only while the security required by regulations of the insurance commissioner remains undiminished, are the health care provider and his insurer liable to a patient, or his representative, for malpractice to the extent and in the manner specified in this Part. (emphasis added)
LSA-R.S. 40:1299.41(D) provides:
A health care provider who fails to qualify under this Part is not covered by the provisions of this Part and is subject to liability under the law without regard to the provisions of this Part. If a health care provider does not so qualify, the patient's remedy will not be affected by the terms and provisions of this Part, except as hereinafter provided with respect to the suspension and the running of prescription of actions against a health care provider who has not qualified under this Part when a claim has been filed against the health care provider for review under this Part. (emphasis added)
[13] A physician could reject PCF coverage for years. Then, after committing a gross act of malpractice for which damages in a lawsuit brought under general tort law and procedure might be in the millions of dollars, the physician could qualify as a health care provider under the Act. Through a claims-made policy with retroactive coverage, the physician could then receive PCF coverage of this tortious conduct, thereby limiting his liability to $100,000 and limiting the victim's recovery to $500,000, even though the PCF coverage had been explicitly rejected prior to the conduct.
[14] Section 12. (A) Prohibitions. Except as otherwise provided in this constitution, the legislature shall not pass a local or special law:

* * * * * *
(7) Creating corporations or amending, renewing, extending, or explaining the charters thereof; granting to any private corporation, association, or individual any special or exclusive right, privilege, or immunity.