775 So.2d 32 (2000)
ST. PAUL FIRE AND MARINE INSURANCE COMPANY
v.
Shirley Autin EUSEA, Medical Protective Insurance Company and the Louisiana Patient's Compensation Fund.
No. 99 CA 2117.
Court of Appeal of Louisiana, First Circuit.
September 22, 2000.
Opinion on Rehearing December 29, 2000.
Rehearing Denied January 25, 2001.
*34 Daniel A. Reed, Baton Rouge, for Plaintiff/Second Appellant, St. Paul Fire and Marine Insurance Company.
P. Chris Christofferson, New Orleans, for Defendant/Appellant, Shirley Eusea.
Marc Judice, Lafayette, for Defendant/Appellee The Medical Protective Company.
Larry M. Roedel, Gregory Frost, David Woolridge, Baton Rouge, for Defendants/Appellees The Louisiana Patient's Compensation Fund and The Louisiana Patient's Compensation Fund Oversight Board.
Before: CARTER, C.J., WEIMER, and FONTENOT,[1] JJ.
CARTER, C.J.
This is an appeal from a declaratory judgment that determined a physician's status as a qualified health care provider under the Louisiana Medical Malpractice Act, LSA-R.S. 40:1299.41 et seq. (the Act). The judgment also determined which of two malpractice insurance policies covering the physician's activities would provide coverage for the malpractice claim asserted against the physician.

FACTS
Dr. Roger Blanchard was participating in a three-year family practice residency with Broadlawns Medical Center of Des Moines, Iowa (Broadlawns). His residency period ran from July 1, 1993, through June 30, 1996. A portion of his residency was spent working at the Ochsner Family Practice Clinic (Ochsner Clinic) in Matthews, Louisiana.
Pursuant to its employment contract with Dr. Blanchard, Broadlawns was to provide medical malpractice insurance for Dr. Blanchard, which would cover his activities during his residency. In fulfillment of its contractual obligation to provide medical malpractice insurance to Dr. Blanchard, Broadlawns included Dr. Blanchard as a covered physician under its excess insurance policy issued by St. Paul Fire and Marine Insurance Company (St. Paul). The excess policy had a liability limit of $30,000,000.00. This policy acted as excess insurance above Broadlawns' self-insured $250,000.00 per loss retention.
In addition to participating in the family practice residency at Ochsner, Dr. Blanchard sought additional income by "moonlighting" at Lady of the Sea General Hospital in Galliano, Louisiana. Dr. Blanchard obtained an occurrence policy of professional liability insurance with The Medical Protective Company[2] (Medical Protective) for the period of February 10, 1995, through October 1, 1995. The Medical Protective Policy contained the following insuring agreement:
[T]he Company hereby agrees to DEFEND and PAY DAMAGES, in the name and on behalf of the Insured or his estate,
A. IN ANY CLAIM FOR DAMAGES, AT ANY TIME FILED, BASED ON PROFESSIONAL SERVICES RENDERED OR WHICH SHOULD HAVE BEEN RENDERED, BY THE INSURED OR ANY OTHER PERSON FOR WHOSE ACTS OR OMISSIONS THE INSURED IS LEGALLY RESPONSIBLE, IN THE PRACTICE OF THE INSURED'S PROFESSION *35 DURING THE TERM OF THE POLICY;
and the following Endorsements:
Professional services, as referred to in this policy, shall mean only those professional services rendered by the Insured and on behalf of LADY OF THE SEA GENERAL HOSPITAL.
* * * * * *
This policy is valid only for the Insured's "moonlighting" activities and does not apply to any aspect of the Insured's training program including any Internship, Residency, or Fellowship conducted by or through any Medical School or Hospital.
Further, this policy does not apply to any professional services rendered or which should have been rendered, after the Insured completes training and enters into the regular, full-time practice of medicine.
At the time he purchased the Medical Protective policy, Dr. Blanchard provided proof of insurance and paid the requested surcharge as a Class I health care provider for coverage as a qualified health care provider with the Louisiana Patient's Compensation Fund (PCF) for the period of February 10, 1995, through October 1, 1995.
On September 19, 1995, Dr. Blanchard examined Shirley Eusea at the Ochsner Clinic for multiple complaints, including a sore throat. Ms. Eusea's malpractice claim alleges Dr. Blanchard failed to run a throat culture or prescribe any form of antibiotics, but instead he released her without a return appointment. Five days later Ms. Eusea was admitted to St. Ann General Hospital, where she was diagnosed with septicemia, which resulted in septic shock and gangrene in her extremities. As a result of the gangrene, all four of Ms. Eusea's extremities were amputated.
On September 24, 1996, Ms. Eusea filed a medical malpractice complaint with the PCF arising out of the treatment she received at St. Ann General Hospital and the Ochsner Clinic from September 19, 1995, through October 3, 1995. Following Ms. Eusea's discovery that Dr. Blanchard was the physician who examined her at the Ochsner Clinic, he was added as an additional defendant on October 22, 1997.
On December 2, 1997, the PCF issued a certificate of enrollment certifying that Dr. Blanchard was a qualified health care provider from February 10, 1995, through October 1, 1995, and acknowledging that all required surcharges had been paid. However, on January 28, 1998, the PCF Oversight Board notified Ms. Eusea that Dr. Blanchard was not a qualified health care provider under the Medical Protective policy for purposes of her claim.
On March 12, 1998, Ms. Eusea filed a petition for damages in the Seventeenth Judicial District Court naming Dr. Blanchard and St. Paul as defendants. By letter dated April 7, 1998, Medical Protective advised Dr. Blanchard that it was denying coverage because the alleged act of malpractice by Dr. Blanchard was committed during his residency program at the Ochsner Clinic. Further, the alleged malpractice did not occur at or on behalf of Lady of the Sea General Hospital.
On September 1, 1998, St. Paul filed a petition for declaratory judgment in the Nineteenth Judicial District Court seeking determinations that 1) Dr. Blanchard is a qualified health care provider under the Act with respect to Eusea's malpractice claim; 2) Dr. Blanchard is entitled to coverage under the Medical Protective policy and the PCF, and 3) the St. Paul policy is in excess of the coverage provided by Medical Protective and the PCF.
At trial the parties submitted a written stipulation of the relevant facts. (Attached hereto as Appendix A.) Following the hearing, the trial court declared that Dr. Blanchard was a qualified health care provider within the intent and meaning of the Act for purposes of Ms. Eusea's claim against him. The trial court also declared *36 that in the event of a judgment against Dr. Blanchard on Ms. Eusea's claim, St. Paul would provide coverage for Dr. Blanchard's individual liability limit of $100,000.00 under the Act. The trial court further found that Medical Protective was not liable to Ms. Eusea, Dr. Blanchard, or St. Paul under the facts of this case.
Ms. Eusea appeals, assigning error with the trial court's findings that Dr. Blanchard was a qualified health care provider under the Act, and in the event of a judgment against Dr. Blanchard, that St. Paul would provide coverage of Dr. Blanchard's $100,000.00 liability and the PCF would be liable for an additional $400,000.00 plus medical expenses.
St. Paul asserts an alternative appeal only in the event that the trial court judgment finding Dr. Blanchard is entitled to qualified health care provider status is not affirmed. St. Paul argues only in the alternative that if we find the trial court erred in declaring Dr. Blanchard a qualified health care provider, then the Medical Protective policy should be reformed to invalidate the exclusions restricting coverage only for his activities at Lady of the Sea General Hospital.

DISCUSSION
The Medical Malpractice Act was passed by the Louisiana Legislature in 1975 in response to a national "medical malpractice crisis," which was driven by rising costs of medical malpractice insurance and the decreasing availability of such coverage. See Branch v. Willis-Knighton Medical Center, 92-3086, p. 9 (La.4/28/94), 636 So.2d 211, 215. It is generally accepted that the principal purposes of the Act are to limit the liability of health care providers, who qualify under the Act and to provide compensation to medical malpractice victims who have been injured by qualified health care providers. See A. Copeland Enterprises, Inc. v. Slidell Memorial Hospital, 94-2011 (La.6/30/95), 657 So.2d 1292, and Prisk v. Palazzo, 95-1475 (La.App. 4th Cir.1/19/96), 668 So.2d 415, writ denied, 96-0437 (La.4/8/96), 671 So.2d 335.
Qualification status under the Act provides that a health care provider will not be liable for an amount in excess of $100,000.00 plus interest for any malpractice claim arising from injuries or death of any one patient. LSA-R.S. 40:1299.42 B(2). To become a qualified health care provider under the Act, the requirements of LSA-R.S. 40:1299.42 must be met. The pertinent requirements under LSA-R.S. 40:1299.42 are as follows:
A. To be qualified under the provisions of this Part, a health care provider shall:
(1) Cause to be filed with the board proof of financial responsibility as provided by Subsection E of this Section.
(2) Pay the surcharge assessed by this Part on all health care providers according to LSA-R.S. 40:1299.44.
* * * * * *
B. (2) A health care provider qualified under this Part is not liable for an amount in excess of $100,000.00 plus interest thereon accruing after April 1, 1991 for all malpractice claims because of injury to or death of any one patient.
* * * * * *
E. (1) Financial responsibility of a health care provider under this Section may be established only by filing with the board proof that the health care provider is insured by a policy of malpractice liability insurance in the amount of at least one hundred thousand dollars per claim with qualification under this Section taking effect and following the same form as the policy of malpractice liability insurance of the health care provider, or, in the event the health care provider is self-insured, proof of financial responsibility by depositing with the board one hundred twenty-five thousand dollars in money or represented by irrevocable letters of credit, federally insured certificates of deposit, *37 bonds, securities, cash values of insurance, or any other security approved by the board.
Ms. Eusea argues that it is improper to allow St. Paul to benefit from the premiums paid by Dr. Blanchard as a means of limiting St. Paul's liability while exposing the PCF to liability claims for which the PCF did not receive the surcharge in derogation of LSA-R.S. 40:1299.44. Ms. Eusea relies upon the case of Williams v. Golden, 611 So.2d 713 (La. App. 4th Cir.1992) to support this argument.
We cannot accept Ms. Eusea's interpretation that Williams requires a separate surcharge be paid to the PCF on behalf of a qualified health care provider for each malpractice insurance policy covering the provider. The Act does not mandate a health care provider paying multiple surcharges in order to achieve qualified status. Moreover, qualification is a status granted to health care providers, not insurance companies. Only the health care provider can take steps to qualify under the Act and avail himself of the Act's benefits. We do not find that insurers who cover previously qualified health care providers receive an unfair benefit.
We also reject the supposition that St. Paul was required to be listed as one of Dr. Blanchard's insurer's in the section 1299.42 E(1) filing. We note the language chosen by the legislature requires a health care provider to provide proof that he is insured by "a policy of malpractice liability insurance" (emphasis ours). The use of the article "a" denotes something singular. See Webster's II New Riverside Dictionary (revised edition 1996). The legislature specifically did not impose a requirement that every or all policies of malpractice insurance covering the health care provider be filed as proof of financial responsibility. Accordingly, Dr. Blanchard's filing of the Medical Protective policy as proof of his financial responsibility satisfied the requirement under the Act.
We cannot say that St. Paul's failure to follow the requirements imposed on self-insurers defeats the benefit of limited liability under the Act. Initially we reiterate that the limited liability is granted to the qualified health care provider not the insurance company. Secondly, this issue does not change the fact that once Dr. Blanchard fulfilled the requirements of becoming qualified under the Act, he is deemed to receive every benefit of the Act. The fact that a particular insurer only covers specific professional activities of a qualified health care provider does not impose an altogether separate qualification filing under the Act with respect to every insurance policy covering the health care provider's professional activities.
Ms. Eusea asserts that a surcharge without an applicable premium for medical malpractice coverage does not qualify a physician under the Act and that the Louisiana Supreme Court case of Abate v. Healthcare International, Inc., 560 So.2d 812 (La.1990) supports this contention.
In Abate, the supreme court addressed a situation where the defendant health care providers were not enrolled in the PCF at the time of the alleged malpractice. Before suit was filed, defendants qualified under the Act. The insurance policies the defendants filed to establish their financial responsibility were claims-made policies with retroactive coverage encompassing the dates of defendants' alleged malpractice. Although the policies were retroactive, the surcharges paid to the PCF did not cover the same retroactive period as the policy, thus the court found the requirements of LSA-R.S. 40:1299.42 were not met to qualify the defendants under the Act at the time of the alleged malpractice.
Again, we disagree with the plaintiffs contention that Abate allows Dr. Blanchard's qualified health care provider status to be limited to the terms of the policy he filed as proof of his financial responsibility. Ms. Eusea's contention *38 that Williams and Abate support the argument that Dr. Blanchard is not a qualified health care provider assumes that the Act allows partial qualification. Our examination of the jurisprudence does not lead us to that conclusion.
The case that is most helpful to our determination of whether Dr. Blanchard is entitled to qualified health care provider status for purposes of Eusea's claim is Eiskina v. Keasler, 511 So.2d 1289 (La. App. 2nd Cir.), writs denied, 514 So.2d 135, 136 (La.1987), wherein the second circuit addressed a situation where a physician, Dr. Stephen R. Keasler, had paid the required surcharge and filed proof of financial responsibility in the form of a malpractice insurance policy issued by Vigilant Insurance Company; however, the Vigilant policy only provided coverage for emergency medicine. A petition for a medical review panel had been filed alleging Dr. Keasler had committed an alleged act of malpractice, yet the alleged act of malpractice was not committed during the performance of emergency services.
The medical review panel issued an opinion questioning whether Dr. Keasler's actions were covered under the provisions of the Vigilant policy and did not consider whether his actions met the applicable standard of care. In light of that opinion, plaintiffs subsequently filed a lawsuit against Dr. Keasler. Vigilant was dismissed from the suit on a motion for summary judgment, contending that Dr. Keasler had not been performing emergency services to the deceased and that the Vigilant policy covered emergency medicine only. The Commissioner of Insurance issued a certificate of enrollment indicating that Dr. Keasler was qualified under the Act for emergency medicine only. Because more than a year had elapsed from the time suit was filed and the alleged act of malpractice, Dr. Keasler filed a peremptory exception raising the objection of prescription. The trial court found that Dr. Keasler was not qualified under the Act and therefore, prescription was not suspended by the filing of a petition for a medical review panel. Thus, the trial court granted the exception of prescription. Eiskina, 511 So.2d at 1290-91
The second circuit reversed the trial court, finding error in the trial court's determination that Dr. Kealser was not a qualified health care provider under the Act. Therefore, the plaintiffs were entitled to the benefit of the suspension of prescription provision in LSA-R.S. 40:1299.47 A. In doing so, the court noted that the Act does not contemplate that a health care provider be qualified only in specific areas of health care, but rather that a physician must qualify with unlimited medical malpractice coverage. Accordingly, any attempt by Vigilant to limit its coverage or Dr. Keasler's qualification to emergency medicine only was void and did not affect his status as a qualified health care provider. Eiskina, 511 So.2d at 1291-92.
The court in Eiskina did not reach the issue of whether Vigilant's policy limitations were enforceable. On the contrary, the trial court had granted summary judgment, dismissing Vigilant based on the policy exclusion, which judgment was not at issue in the appeal. See Eiskina, 511 So.2d at 1292. However, the second circuit made it clear that a health care provider's qualification under the Act was not limited to the coverage provisions of the filed malpractice insurance policy.
We agree. The requirements of LSA-R.S. 40:1299.42 do not contemplate partial qualification of health care providers. LSA-R.S. 40:1299.42 E alerts those health care providers that their proof of financial responsibility and, hence, their qualification under Sec. 1299.42, is effective only for "the same period and following the same form" as their filed policy of malpractice liability insurance. In other words, any lapse in the malpractice liability insurance policy filed as proof of financial responsibility, through either its effective period or form (occurrence or claims-made), renders the health care provider *39 unqualified during the period of lapse. Abate, 560 So.2d 812, 817 (La.1990).
Clearly, Dr. Blanchard satisfied the requirements of LSA-R.S. 40:1299.42 to obtain his status as a qualified health care provider under the Act. Accordingly, Dr. Blanchard's qualified health care provider status cannot be limited by the exclusions of the Medical Protective policy he filed as proof of his financial responsibility. Accordingly, the trial court correctly determined that Dr. Blanchard was entitled to qualified health care provider status under the Act for purposes of Eusea's claim. Because we find the trial court was correct in its determination that Dr. Blanchard is a qualified health care provider, we need not address the alternative appeal asserted by St. Paul regarding whether the Medical Protective policy conflicts with LSA-R.S. 40:1299.25 C, viz. whether the exclusions contained in the Medical Protective policy are against public policy.[3]
We recognize that when litigants are confronted with statutorily imposed limitations on the amount of recoverable damages that there is always the possibility of a scenario where the amount of damages sustained by a claimant will exceed the statutory limit. Although we are extremely sympathetic to those claimants thrust into such situations, we must follow the clear dictates of the legislature. A change in the statutory limitations on recoverable damages should be addressed by the Louisiana Legislature.

CONCLUSION
We find that the trial court was correct in determining that Dr. Blanchard was a qualified health care provider. Dr. Blanchard complied with the statutory requirements for obtaining qualification under the Act. Further, Dr. Blanchard's status as a qualified health care provider under the Act is not limited by the exclusions in the Medical Protective malpractice liability policy. Accordingly, the judgment of the trial court finding Dr. Blanchard is a qualified health care provider and the St. Paul policy provides coverage for Dr. Blanchard's individual liability limits of $100,000.00 in the event of a judgment in favor of Shirley Eusea, is affirmed. All costs of this appeal are assessed against St. Paul Fire & Marine Insurance Company.
AFFIRMED.
WEIMER, J., dissents with reasons.
WEIMER, J., dissenting.
St. Paul did not accept payment of the surcharge as contemplated by LSA-R.S. 40:1299.42(A)(3). St. Paul was not listed as the malpractice liability insurance carrier in the filing required by LSA-R.S. 40:1299.42(E)(1). The failure to strictly comply with the statute is fatal to St. Paul's assertion it is entitled to the benefit of the limited liability provided by the Medical Malpractice Act, LSA-R.S. 40:1299.41 et seq. There is no statutory basis for what amounts to a substitution of St. Paul for Medical Protective Company when there was a failure to comply with the Act as it relates to St. Paul.
I believe Dr. Blanchard is a qualified health care provider. He did all that he was required to do under the act: he paid the surcharge and he provided proof of liability insurance with the Medical Protective policy. See LSA-R.S. 40:1299.42.
Under the unique facts and circumstances of this case, I would find St. Paul has an obligation to provide coverage to the full extent of its contractual obligation to Broadlawns and Dr. Blanchard. Additionally, because St. Paul did not appeal the finding of the trial court, it is also *40 liable for the initial $100,000.00, if liability and damages are established.[1] Recognized purposes of the Medical Malpractice Act are to reduce medical malpractice insurance rates and to ensure the availability of affordable medical services to the public. Hutchinson v. Patel, 93-2156, p. 8 (La.5/23/94), 637 So.2d 415, 422. Another purpose of assuring affordable rates for medical malpractice insurance is to encourage medical care providers to purchase insurance coverage. See Butler v. Flint Goodrich Hospital of Dillard University, 607 So.2d 517, 521 (La.1992), cert. denied, 508 U.S. 909, 113 S.Ct. 2338, 124 L.Ed.2d 249 (1993), (three effects of the Act inuring to the benefit of patients severely injured by medical malpractice are: greater likelihood that the offending physician or other health care provider has malpractice insurance; greater assurance of collection from a solvent fund; and payment of all medical care and related benefits). There was no evidence to dispute the fact St. Paul collected anything but the full premium for providing coverage.
In this matter, there is a gap in the medical malpractice insurance coverage required by the act. Broadlawns is self-insured for the first $250,000.00 of liability. However, there is no evidence Broadlawns was qualified under the Act in Louisiana as a self-insured health care provider. St. Paul is an excess carrier, providing coverage over Broadlawns' $250,000.00 limit of liability.
Holding the Medical Malpractice Act is not applicable to St. Paul under the extraordinary facts of this case is not barred by Descant v. Administrators of Tulane Educational Fund, 93-3098 (La.7/5/94), 639 So.2d 246, which is factually distinguishable. In Descant, the Louisiana Supreme Court held an excess liability carrier could not be held liable for more than the liability of the health care provider it insured because that insurer's liability was co-extensive with the liability of its insured.[2] In that case, there was no gap in the medical malpractice insurance coverage as there is in the instant case. Apparently, in Descant, there was full compliance with the Act as it related to the coverage provided by the primary carrier.
Relative to the contention of St. Paul that the Medical Protective policy should be reformed to provide coverage, I believe the Medical Protective exclusions are unambiguous, easily understood, and obviously specifically negotiated. Dr. Blanchard purchased insurance for a specific, limited purposeto cover his moonlighting activities at Lady of the Sea General Hospital. I would feel differently if the Medical Protective policy contained exclusions which were ambiguous, and difficult to understand, and buried in fine print, and not specifically negotiated.
In sum, I believe St. Paul is contractually bound to provide coverage to the full extent of its insurance policy and does not benefit from the limited liability provisions of the Medical Malpractice Act.

ON APPLICATION FOR REHEARING
PER CURIAM.
For the reasons contained in the dissent to the original opinion, and for the reasons set forth herein, we conclude that under the policy issued, St. Paul Fire and Marine Insurance Company is not entitled to a liability limitation of $100,000.
The particular facts and circumstances of this case are catalysts for a careful *41 examination of the applicability of the Medical Malpractice Act. Such review requires a departure from our original notion that every insurer of a qualified health care provider is automatically entitled to the limitation of liability contained in the Act. Judge Weimer's dissent to the original opinion highlights an important factual distinction regarding St. Paul's role in this litigation that cannot be ignored.
Specifically, Dr. Roger Blanchard was an employee of Broadlawns Medical Center, which is a self-insured entity for the first $250,000 of liability. St. Paul issued a policy of excess insurance coverage to Broadlawns, thereby forming a contractual relationship between those entities.
Generally, legal agreements have the effect of law between the parties, and, as they bind themselves, they shall be held to a full performance of the obligations flowing therefrom. Sanders v. Ashland Oil, Inc., 96-1751, p. 7 (La.App. 1 Cir.6/20/97), 696 So.2d 1031, 1036, writ denied, 97-1911 (La.10/31/97), 703 So.2d 29. Subject to the limits imposed by law, parties are free to contract as they choose. Osborne v. Ladner, 96-0863, p. 10 (La.App. 1 Cir. 2/14/97), 691 So.2d 1245, 1254.
When these facts are closely examined, we cannot conclude that St. Paul had any contractual expectation that its liability would be limited under the Medical Malpractice Act. There is no indication in the record that St. Paul imposed a requirement on Broadlawns to take advantage of liability limitations in jurisdictions where Broadlawns' employees engaged in covered activities. The nature of St. Paul's status as an excess insurer does not allow this court to alter the provisions of the contractual relationship between Broadlawns and St. Paul by limiting St. Paul's liability contained in its policy.
In addition to St. Paul not being listed as a malpractice liability insurer of Dr. Blanchard, nor accepting payment of the surcharge imposed under the Act, there is no indication that the premiums assessed by St. Paul were in any way modified by Dr. Blanchard's qualification under the Act. This court is certain that St. Paul received consideration for providing the amount of coverage that is set forth in its policy. There is no indication that the liability limits provided for in the St. Paul policy were in any manner affected or influenced by the Louisiana Medical Malpractice Act. There is no evidence that the St. Paul policy was ever negotiated, purchased, or issued with any consideration that the provisions of the Louisiana Medical Malpractice Act would affect its terms and limits because of the actions of an employee of its insured, Broadlawns Medical Center. St. Paul cannot prevail in arguing that the failure to impose the $100,000 liability limit would undermine the purpose of the Act since there is no evidence that St. Paul ever contemplated receiving the benefits of the Act.
Considering these facts and the jurisprudential tenet that the Medical Malpractice Act must be strictly construed, we decline to limit the potential liability of the policy issued by St. Paul to $100,000. Accordingly, we conclude that St. Paul Fire and Marine Insurance Company should be bound to the full extent of its contractual obligation to Broadlawns and its employee, Dr. Blanchard.
Accordingly, this court vacates the portion of its previous opinion limiting St. Paul's potential liability under its policy to $100,000 and renders judgment in favor of Shirley Eusea, reversing the trial court's determination that St. Paul is entitled to the liability limitation contained in the Medical Malpractice Act. St. Paul is contractually bound to provide coverage to the full extent of its insurance policy and does not benefit from the limited liability provision of the Medical Malpractice Act. The trial court's determination that Dr. Roger Blanchard is a qualified health care provider is affirmed. The trial court's finding that St. Paul is liable for the first $100,000 was not appealed and is a final judgment. *42 St. Paul Fire and Marine Insurance Company is cast for costs of this appeal.
PREVIOUS OPINION VACATED IN PART; JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.
WEIMER, J., agrees and assigns additional reasons in original dissent.
FONTENOT, J. concurs in result only.
NOTES
[1] Honorable H. Ward Fontenot, 38th Judicial District Court, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The insurer is incorrectly referred to as Medical Protective Insurance Company in St. Paul's petition for declaratory judgment.
[3] LSA-R.S. 40:1299.45 C provides:

Any provision in a policy attempting to limit or modify the liability of the insurer contrary to the provisions of this part is void, except that a provision in a malpractice liability insurance policy approved by the board which limits the aggregate sum for which the insurer may be liable during the policy period shall be valid.
[1] In casting St. Paul liable for the first $100,000, the trial court ignored the fact St. Paul is an excess carrier. St. Paul did not appeal this finding.
[2] But see the dissent of Justice Lemmon, wherein he notes that no purpose of the Medical Malpractice Act is furthered by extending the limitation on recovery to the health care provider's excess insurer, which merely covers any possibility of professional liability above the Act's limits and which received a premium for providing the coverage. Descant, 93-3098 at dissent, p. 2, 639 So.2d at 253.