# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

**22-48**


RICHARD DICKSON

VERSUS

DR. ISAAC A. ODUDU


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT
PARISH OF CONCORDIA, NO. 52616
HONORABLE JOHN C. REEVES, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**CANDYCE G. PERRET**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Elizabeth A. Pickett, Van H. Kyzar, and Candyce G. Perret,
Judges.


**AFFIRMED.**

**David A. Woolridge, Jr.**
**Brent Bourgeois**
**Alexander-Sides**
**4232 Bluebonnet Boulevard**
**Baton Rouge, LA   70809**
**(225) 490-7422**
**COUNSEL FOR DEFENDANT/APPELLANT:**
       **Patient's Compensation Fund Oversight Board**

**Lawrence W. Pettiette, Jr.**
**Joseph S. Woodley**
**Pettiette, Armand, Dunkelman, Woodley, Byrd & Cromwell, L.L.P.**
**Post Office Box 1786**
**Shreveport, LA   71166-1786**
**(318) 221-1800**
**COUNSEL FOR DEFENDANT/APPELLEE:**
       **Dr. Isaac Odudu**

**Madeline J. Lee**
**Bolen, Parker, Brenner, Lee & Miller, LTD**
**Post Office Box 11590**
**Alexandria, LA   71315-1590**
**(318) 445-8236**
**COUNSEL FOR DEFENDANT/APPELLEE:**
       **Dr. Isaac Odudu**

**Eric E. Helm**
**Post Offfice Box 1909**
**Baton Rouge, LA   70821**
**(225) 344-3555**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
       **Richard Dickson**

**PERRET, Judge.**

In this medical malpractice lawsuit, the Louisiana Patient's Compensation Fund Oversight Board ("Oversight Board") seeks review of the trial court's judgment granting the exception of prematurity filed by defendant, Dr. Isaac Odudu. The trial court's judgment centered on its determination that Dr. Odudu is "a qualified health care provider under the laws of the State of Louisiana for the medical care giving rise to this claim" and dismissed the suit, without prejudice, pending completion of the medical review panel. For the following reasons, we hereby affirm.

**FACTS:**

On August 27, 2019, a request for a medical review panel was filed on behalf of the plaintiff, Richard Dickson, naming Dr. Odudu and other healthcare providers as defendants.[1] On September 4, 2019, the Patient's Compensation Fund ("PCF") informed Mr. Dickson's counsel that Dr. Odudu was a qualified health care provider enrolled in the fund; however, on September 24, 2019, the PCF reported that Dr. Odudu was not enrolled with the fund and, thus, not entitled to have the medical malpractice claims asserted against him reviewed by a medical review panel. Thereafter, on December 6, 2019, Mr. Dickson filed a petition for damages against Dr. Odudu alleging "that the direct and vicarious negligence of Dr. Odudu caused or significantly contributed to the above-the-knee amputation of his right leg and femoral artery embolectomy on September 11, 2018."

On January 2, 2020, Dr. Odudu filed a petition for declaratory relief and a dilatory exception of prematurity against the Oversight Board. Specifically, the

---

[1] Mr. Dickson alleges acts of medical malpractice by various health care providers, including Dr. Odudu, between September 3, 2018, and September 11, 2018.

petition for declaratory relief alleged, in pertinent part (references to exhibits omitted):

3.

At the time of the alleged malpractice, Dr. Odudu was a qualified health care provider with the PCF, covered by a medical malpractice liability policy from May 1, 2018, to May 1, 2019.

4.

On May 1, 2019, prior to the termination of the claims-made policy, Dr. Odudu's underlying malpractice liability policy was retroactively amended to provide "occurrence" coverage.

5.

As an "occurrence" policy, Dr. Odudu's malpractice liability policy provided coverage for any loss suffered during the policy term, regardless of when a claim for the loss was asserted.

In the petition, Dr. Odudu argues that "Louisiana statutory and jurisprudential law dictate that once a health care provider is qualified with the PCF, his or her qualification continues to run concurrently with the underlying malpractice liability policy, regardless of whether an additional surcharge is paid for the current term or policy." To support his petition Dr. Odudu attached the following exhibits: (1) Mr. Dickson's request for a medical review panel; (2) a National Fire & Marine Insurance Company ("NF&M") policy (policy number ESO34806) issued to Global Physicians Network, LLC, for the period of May 1, 2018 to May 1, 2019; (3) correspondence from the PCF indicating that "GPN/Ferriday, LLC" and "Global Physicians Network, LLC" are health care providers "certified as an Enrollee under La.R.S. 40:1231:1[;]" and (4) September 24, 2019 correspondence from the PCF's Medical Malpractice Compliance Director noting that Dr. Odudu was initially qualified by the PCF on September 4,

2019, but that as of September 24, 2019, he "is being reported as not-qualified for acts of medical malpractice under the provisions of R.S. 40:1231.8 et seq[.]"

In his supplemental and amended petition for declaratory relief filed on April 8, 2021, Dr. Odudu amended, removed, and added language to his original petition. Specifically, the supplemental and amended petition states, in pertinent part (references to exhibits omitted):

1.

By amending paragraph 3 as follows:

"3.

At the time of the alleged malpractice, Dr. Odudu was a qualified health care provider with the PCF, covered by a medical malpractice liability policy from May 1, 2017, to May 1, 2021."

2.

By removing paragraphs 4 and 5, which state:

"4.

On May 1, 2019, prior to the termination of the claims-made policy Dr. Odudu's underlying malpractice liability policy was retroactively amended to provide "occurrence" coverage.

5.

As an "occurrence" policy, Dr. Odudu's malpractice liability policy provided coverage for any loss suffered during the policy term, regardless of when a claim for the loss was asserted."

3.

By adding paragraph 12:

"12.

At the time that the PCF complaint was filed by plaintiff, Dr. Odudu was a qualified health care provider with the PCF, covered by a medical malpractice policy endorsement that provided tail coverage to Dr. Odudu."

3

In his memorandum in support of the exception of prematurity, Dr. Odudu argues that he "is a qualified healthcare provider under the provisions of La.R.S. 40:1231.8, pursuant to the Petition for Declaratory Relief that is being filed on his behalf concurrently with this exception." Dr. Odudu requests that Mr. Dickson's petition be dismissed, without prejudice, pending completion of the medical review panel. On April 12, 2021, the Oversight Board answered with a general denial of the allegations of Dr. Odudu's supplemental and amended petition for declaratory relief.

On June 28, 2021, Dr. Odudu filed an amended memorandum in support of the exception of prematurity wherein he argued that he is a qualified health care provider enrolled in the PCF and thus, this lawsuit is premature. Specifically, the summary of his argument states as follows (footnote omitted):

> Isaac A. Odudu, M.D. is an emergency room physician who, at all times relevant to Plaintiff[']s claim, was enrolled with the Louisiana Patient's Compensation Fund ("Fund" or "PCF") as a qualified health care provider ("QHCP") under Louisiana's Medical Malpractice Act ("MMA" or the "Act"). To qualify as a QHCP in Louisiana, a doctor must file proof of professional liability insurance with the Fund showing limits of at least $100,000 per claim, and pay a PCF surcharge. Once qualified, providers are entitled to a limitation on the amount of damages that can be awarded against them for medical malpractice, with amounts awarded in excess of that limitation becoming the responsibility of the Fund up to the caps specified by the Act.
>
> At all relevant times - including at the time the services were provided and when the claim was first made - Dr. Odudu was insured under a primary professional liability insurance policy with limits of liability sufficient to meet the requirements of the Act. Proof of this coverage was provided to the Fund, and the requisite surcharge was paid on his behalf. In fact, Dr. Odudu has never had a gap in his underlying coverage and was enrolled with the Fund as a qualified health care provider for the entire time relevant to this claim. His insurance coverage for this claim has been acknowledged by the underlying insurer, and he is being defended in this lawsuit by that insurer.

At the time of treatment at issue, Dr. Odudu was an independent contractor providing emergency room services through a limited liability corporation, GPN Ferriday, LLC ("GPN Ferriday"). The Fund alleges that GPN Ferriday failed to pay its surcharge for the PCF's extended reporting period (the "PCF Tail"), and that as a result, all providers working on behalf of GPN Ferriday lost their QHCP status. In so doing, the PCF has ignored the structure of the underlying policy which covers Dr. Odudu and GPN Ferriday, and impermissibly tied Dr. Odudu's QHCP status to an entirely separate health care provider. The Fund then compounded these errors by failing to provide notice to either Dr. Odudu or his insurer that his QHCP enrollment status had been revoked. Dr. Odudu has been substantially prejudiced by the PCF's unilateral decision, not only losing the benefit of the Fund's excess coverage, but also the cap on his personal liability provided under the Act.

Summarily, Dr. Odudu is a QHCP under the MMA because: (1) he met all requirements of the MMA to become a QHCP, including filing proof of insurance and paying the surcharge; (2) due to its misunderstanding of the structure of GPN Ferriday's underlying insurance policy - a policy specifically designed to prevent the inadvertent gapping of an insured's insurance coverage - the Fund erred in assessing a surcharge to GPN Ferriday for a separate PCF Tail, thereby leading to gaps in Dr. Odudu's and GPN Ferriday's Fund coverage; (3) Dr. Odudu's QHCP enrollment did not expire due to the failure to pay additional surcharges for a PCF Tail because his coverage runs concurrently with the underlying policy; and (4) the PCF failed to provide notice to Dr. Odudu or his insurer that his QHCP status had been revoked due to the alleged failure of GPN Ferriday to pay the PCF Tail surcharge, thereby preventing either Dr. Odudu or his insurer from taking timely action to ensure the surcharge was paid.

In summary, because Dr. Odudu was at all relevant times a QHCP enrolled in the Fund, this lawsuit is premature and should be dismissed without prejudice, and the claim submitted for a pre-suit evaluation by a Medical Review Panel in accordance with the MMA.

In support of his amended memorandum on the exception of prematurity, Dr. Odudu attached his June 21, 2021 affidavit, which states as follows:

1.

I am a licensed physician in the state of Louisiana. My medical license has never been suspended or revoked, nor have I ever been the subject of any disciplinary action. I am now, and have been at all times, a physician in good standing, and to my knowledge, have always been a qualified health care provider.

## 2.

I practice Emergency Room Medicine ("ER") with board certifications in pediatrics, ACLS [Advanced Cardiovascular Life Support], ATLS [Advanced Trauma Life Support], PALS [Pediatric Advanced Life Support, & BLS [Basic Life Support].

## 3.

At the time of Plaintiff's treatment, I was an independent contractor working for Global Physicians Network, LLC ("Global Physicians"), an entity that, through its subsidiaries, contracted with various medical facilities to provide physicians to staff emergency rooms. During my tenure with Global Physicians, I entered into independent contractor agreements ("Contractor Agreements") with two of Global Physician's subsidiaries, GPN Ferriday, LLC ("GPN Ferriday"), and GPN Leesville, LLC ("GPN Leesville") during the relevant time period. The Contractor Agreements obligated the staffing entity to provide me with insurance coverage sufficient to meet my obligations under applicable law. Global Physicians was also responsible for ensuring that I and other physicians and subsidiaries were registered as qualified health care providers with the Louisiana Patient's Compensation Fund, and for paying the required surcharges.

## 4.

As a contractor for GPN Ferriday, I provided emergency room services at Riverland ER from May 15, 2017 through December of 2018 (including at the time of Plaintiff's treatment). As a contractor for GPN Leesville, I provided services at Byrd Regional Hospital ("Byrd Hospital") from May 1, 2018 through April of 2019. I was assigned to each of these locations by Global Physicians. At the time I provided services to Plaintiff, I was working at both Riverland ER and Byrd Hospital.

## 5.

In December of 2018, GPN Ferriday lost its contract with Riverland ER, and ceased operations on December 31, 2018. However, I continued working at Riverland ER through the new staffing entity, and continue working there to this day. I also continued working for GPN Leesville at Byrd Hospital until approximately May 1, 2019, the date that Global Physicians, along with all remaining subsidiaries including GPN Leesville, ceased operations. My contractual relationship with Global Physicians and its subsidiaries terminated at that time only because Global Physicians had ceased operations.

6

6.

After Global Physicians ceased operations, I continued working at various hospitals as an emergency room physician (including Riverland ER) through another staffing entity, Professional Physician Associates, which continues to the present. I remain enrolled as a qualified health care provider currently.

7.

Attached as Exhibit "A", are the relevant Certificates of Enrollment and Certificates of Liability Insurance, which show that I was always a qualified health care provider from May 15, 2017, to the present.

8.

I was never notified that the PCF surcharge for tail coverage for GPN Ferriday was not paid until my attorney informed me after this PCF complaint was filed.

Dr. Odudu also attached the June 22, 2021 affidavit of Marc Fireoved, an employee of MedPro Group, Inc., the administrator on behalf of NF&M, to further support his amended memorandum on the exception of prematurity. Mr. Fireoved testified as follows, in pertinent part (emphasis added):

3.

The NF&M Policy is a specialized policy designed to provide professional liability insurance coverage to *locum tenens* and contract staffing organizations, as well as to their contract employees, for services provided while providers are contracted to medical facilities. The NF&M Policy is a "claims-made and reported" professional liability insurance policy with a policy period for May 1, 2018 to May 1, 2019. In order to trigger coverage, a claim must arise from an accident in rendering professional services that occurs on or after the retroactive date but before the end of the policy period. Additionally, the claim must be first made against an insured during the policy period, and reported to NF&M during the policy period or within 30 days thereafter.

4.

The NF&M Policy covers individuals and entities that meet the definition of insured under a Contract Staffing, and Locum Tenens Professional Liability Insuring Agreement ("Contract Staffing Insuring Agreement"). The Contract Staffing Insuring Agreement

defines insureds to include contract staffing organizations and covered providers.

5.

The NF&M Policy is not like most other claims-made professional liability in that extended reporting periods, or tails, are added to the policy only in very rare circumstances, and are not needed on a piecemeal basis for each departing provider. As long as the policy is in effect, providers can leave the employ of a scheduled insured, or a contract staffing organization can cease operations, and coverage continues uninterrupted without the need for a tail being issued for that departing insured. If a covered provider has provided services at a facility listed as a scheduled contract staffing organization on the NF&M Policy, but later moves to different employment, claims arising from that covered provider's acts or omissions while acting on behalf of a scheduled contract staffing organization continue to be covered with no tail being issued to the departed provider. Likewise, if a contract staffing organization loses a contract and ceases operations, but its parent company continues to operate and the NF&M Policy remains effective, the departed contract staffing organization remains covered without the need for a tail, and the NF&M Policy will be triggered for any claim made during the policy period which arises from services rendered by the contract staffing organization after its retroactive date but before it ceases operations.

6.

The specialized NF&M Policy was developed to address the high turnover that often affects contract staffing organizations. Staffing entities cease doing business when they lose contracts (despite their parent companies continuing operations), and contract employees often seek full time work while they provide locum tenens services as independent contractors for staffing organizations. Thus, *locum tenens* and contract staffing organizations experience substantially higher turnover than do other types of medical care entities. Absent a policy structure like NF&M's, first named insureds must keep track of and purchase a tail for every subsidiary no longer in operation, and for every provider leaving their employ. This often amounts to keeping track of hundreds of departing providers and multiple closed facilities. This complexity is compounded in states like Louisiana that have patient's compensation funds, requiring the first named insured to tail out each departed provider with the applicable fund and to keep track of tails issued and surcharges paid. A policy which allows these "Departed Insureds" to continue to be covered without the need for the issuance of multiple tails provides much needed flexibility to first named insureds, and prevents the unintentional gapping of providers if the first named insured inadvertently fails to purchase a tail for a departed provider. And, although tails are sometimes added to

8

NF&M policies with this unique structure, this is rare and ordinarily occurs when the policy is being closed out completely, such as when a first named insured sells its business, or simply ceases operations for other reasons.

. . . .

8.

**NF&M was informed that Global Physicians ceased to do business on around May 1, 2019. Global Physicians, through its agent, sought an extended reporting period quote from NF&M for coverage for claims arising after the expiration of the policy period. Global Physicians purchased a tail (the "NF&M ERP") which allows the reporting of claims first made against insureds between May 1, 2019 and May 1, 2021, subject to all other terms and conditions of the policy.**

9.

NF&M has confirmed that Isaac A. Odudu, M.D. ("Dr. Odudu") qualifies as an insured and meets the definition of a covered provider for the services he rendered to the [Mr. Dickson] at Riverland Medical Center Emergency Department ("Riverland ER") through GPN Ferriday. NF&M has also confirmed that GPN Ferriday meets the definition of a contract staffing organization under the NF&M Policy, as does GPN Leesville, LLC ("GPN Leesville"). Thus, GPN Ferriday and GPN Leesville are insured under the NF&M Policy as defined contract staffing organizations.

10.

NF&M has determined that [Mr. Dickson's] claim was first made in September of 2019 during the NF&M ERP. [Mr. Dickson's] claim thus falls within the duration of the NF&M ERP, and Dr. Odudu, as a covered provider, has insurance coverage under the NF&M ERP. Likewise, GPN Ferriday and GPN Leesville are both scheduled contract staffing organizations under the NF&M ERP, and if a claim were made against either entity, it would be covered, subject to all other terms and conditions of the NF&M Policy.

On August 16, 2021, the Oversight Board filed a memorandum in opposition to Dr. Odudu's petitions for declaratory relief and exceptions of prematurity. It argued that the underlying coverage is not in dispute as it is uncontested that NF&M is providing underlying coverage but that "there is no PCF coverage for the

claim by the Plaintiffs against Dr. Odudu because GPN [Global Physicians Network, LLC] failed to <u>timely</u> pay the PCF tail surcharge when its subsidiary, GPN-Ferriday, ceased doing business and GPN clearly had notice of such requirement." (emphasis in original). The Oversight Board explains how PCF coverage and PCF surcharges are different than underlying insurance coverage and insurance premiums, noting:

(a) the Fund is statutorily required to be "actuarially sound" and the PCF surcharge rates are based on actuarial principles;

b) Global Physicians Network, LLC ("GPN"), the parent company of GPN-Ferriday, LLC ("GPN-Ferriday"), had a choice of how to secure and initially pay for (1) underlying insurance coverage and (2) PCF coverage, as it formed subsidiaries and contracted with emergency room physicians ("ER physicians") to provide ER services around the state of Louisiana and those choices impacted whether an insurance tail premium and a PCF tail surcharge was required to be paid for each subsidiary and its associated ER physicians as it/they ceased operations or at the time the very last subsidiary ceased operations;

(c) as explained below, the PCF surcharge rates for entities like GPN-Ferriday and its ER physicians are calculated differently than any other surcharge rates;

(d) the choices GPN made with respect to securing underlying insurance coverage for its subsidiaries and their associated ER physicians as it began expanding and providing ER physicians at various locations throughout Louisiana (i) allowed it to initially pay a lesser amount for its PCF coverage at each location; but that choice then (ii) required GPN to pay for PCF tail coverage (i.e., pay the PCF tail surcharge) as each subsidiary of GPN (such as GPN-Ferriday) ceased operations (instead of paying at the time the very last subsidiary ceased operations) if it desired to have PCF coverage for claims filed after the subsidiary ceased operations;

(e) GPN and at least two of its subsidiaries (GPN/New Iberia, LLC and Lewis Avenue, LLC) previously recognized the need to pay for PCF tail coverage when they ceased operations and did in fact pay a PCF tail surcharge for each of the subsidiaries when they ceased operations two years before GPN-Ferriday ceased operations;

(f) when the last group of GPN subsidiaries ceased operations, GPN only paid a PCF tail surcharge for those subsidiaries, which did NOT include GPN-Ferriday; and

(g) a physician having underlying insurance coverage for a malpractice claim does not automatically equate to PCF coverage for said claim if the proper PCF surcharge (in this case, a PCF tail surcharge) had not been paid to the Oversight Board.

On September 13, 2021, a hearing was held on Dr. Odudu's exception of prematurity. On October 13, 2021, the trial court granted the exception upon finding that "Dr. Isaac A. Odudu is deemed to be a qualified health care provider under the laws of the State of Louisiana for the medical care giving rise to this claim at Riverland Medical Center in Concordia Parish in September, 2018[.]" As such, the trial court dismissed Mr. Dickson's petition against Dr. Odudu without prejudice.

The Oversight Board now appeals, alleging the following seven assignments of error (footnotes and citations omitted) (emphasis in original):

1.

The Trial Court, in adopting the Findings of Facts proposed by Dr. Odudu and not relying on both the documentary evidence and testimony provided by Ms. Moss with the PCF at the hearing, clearly committed error when it found that (i) GPN paid the "required surcharge" to the PCF for the coverage provided by the PCF; and (ii) Dr. Odudu was PCF qualified for the claim filed by the Plaintiffs herein.

2.

The Trial Court committed error in finding that no PCF tail surcharge was required to be paid for Dr. Odudu to have PCF coverage for the Plaintiffs' claim herein, clearly contrary to (i) the testimony of Ms. Moss with the PCF; [(ii)]various provisions in the PCF Rate Manual . . . ; and (iii) LAC 37, Part III, § 715(C)(1).

3.

Even though the payment by GPN for the PCF tail surcharge for six of its subsidiaries (most importantly, a PCF tail surcharge was not paid for GPN-Ferriday, where Dr. Odudu provided the alleged malpractice services) would not have been timely so as to provide PCF coverage for Dr. Odudu for the Plaintiffs' claim herein, the Trial Court erred in not specifically finding that the PCF tail surcharge that was paid by GPN did not include any amount for GPN-Ferriday.

11

4.

The Trial Court erred in finding that the PCF Rate Manual "requires that the PCF coverage follow the form <u>and content</u> of the health care provider's underlying policy".

5.

The Trial Court erred in finding that the Oversight Board/PCF failed to notify Dr. Odudu and NF&M that PCF qualification for Dr. Odudu and GPN-Ferriday was terminated at the request of Ms. Floyd, GPN's insurance agent, and that somehow prohibits the Oversight Board/PCF from reporting Dr. Odudu as not PCF qualified for the Plaintiffs' claim herein.

6.

The Trial Court erred in interpreting the language in La. R.S. 40:1231.2(E)(1), ". . . with qualification under this Section taking effect and following the same form as the policy of malpractice liability insurance of the health care provider . . .", as a basis for concluding that ". . . as long as the provider was [PCF] qualified prior to and at the time of the alleged malpractice, the provider remains [PCF] qualified . . .".

7.

The Trial Court erred in finding and decreeing that Dr. Odudu was PCF qualified for the Plaintiffs' claim herein, where a PCF tail surcharge was not paid for PCF tail coverage/PCF extended reporting endorsement.

**STANDARD OF REVIEW:**

"The dilatory exception of prematurity provided in La.Code Civ.Proc. art. 926 questions whether the cause of action has matured to the point where it is ripe for judicial determination." *Williamson v. Hosp. Serv. Dist. No. 1 of Jefferson*, 04-451, p. 4 (La. 12/1/04), 888 So.2d 782, 785. "An action is premature when it is brought before the right to enforce it has accrued." *Id.* at 785. Under the Louisiana Medical Malpractice Act, "a medical malpractice claim against a private qualified health care provider is subject to dismissal on an exception of prematurity if such claim has not first been presented to a medical review panel." *LaCoste v.*

12

*Pendleton Methodist Hosp., L.L.C.*, 07-0008, p. 6 (La. 9/5/07), 966 So.2d 519, 523. The dilatory exception of prematurity "is the proper procedural mechanism for a qualified health care provider to invoke when a medical malpractice plaintiff has failed to submit the claim" to the "medical review panel before filing suit against the provider." *Id.* at 523. The party raising the exception carries the burden of proving prematurity. *Id.* On appeal, a judgment granting an exception of prematurity is reviewed under the "manifest error standard of review unless it involves a question of law." *Barlow v. Garber*, 17-401, p. 2 (La.App. 3 Cir. 11/2/17), 230 So.3d 1002, 1004.

**DISCUSSION:**

The Louisiana Legislature enacted the Medical Malpractice Act ("the Act") in 1975 in response to a "'perceived medical malpractice insurance 'crisis.'" *Williamson*, 888 So.2d at 785 (quoting *Hutchinson v. Patel,* 93-2156 (La. 5/23/94), 637 So.2d 415, 419. As the supreme court stated in *Williamson*, 888 So.2d at 785-786 (internal citations omitted):

> The legislature intended the Act to reduce or stabilize medical malpractice insurance rates and to assure the availability of affordable medical services to the public. We have recognized that, to achieve those goals, the Act gives qualified health care providers two substantial advantages in actions against them for malpractice, namely, a limit on the amount of damages and the requirement that the claim first be reviewed by a medical review panel before commencing suit in a court of law.

The issue presented in this case is whether Dr. Odudu is a "qualified health care provider" under the Act so as to require that a medical review panel review Mr. Dickson's claims against Dr. Odudu prior to the institution of a lawsuit. There is no dispute that Dr. Odudu fits the definition of a "health care provider" under

La.R.S. 40:1231.1 because he is a Louisiana licensed physician.[2] However, we must determine whether Dr. Odudu is "qualified" under the Act so as to bring him within the protections of the Act. Louisiana Revised Statutes 40:1231.2 addresses the qualifications a health care provider must possess in order to be "qualified" under the Act and provides, in pertinent part:

> A. To be qualified under the provisions of this Part, a health care provider shall:
>
> > (1) Cause to be filed with the board proof of financial responsibility as provided by Subsection E of this Section.
> >
> > (2) Pay the surcharge assessed by this Part on all health care providers according to R.S. 40:1231.4.

Thus, a health care provider must file the type of proof of financial responsibility described in Subsection E of La.R.S. 40:1231.2 and pay the annual PCF's surcharge levied on the health care provider. The requirement of proof of financial responsibility is explained in La.R.S. 40:1231.2(E)(1), which states, in pertinent part:

---

[2] La.R.S. 40:1231.1(10) provides the definition of a health care provider as follows:

"Health care provider" means a person, partnership, limited liability partnership, limited liability company, corporation, facility, or institution licensed or certified by this state to provide health care or professional services as a physician, hospital, nursing home, community blood center, tissue bank, dentist, a licensed dietician or licensed nutritionist employed by, referred by, or performing work under contract for, a health care provider or other person already covered by this Part, registered or licensed practical nurse or certified nurse assistant, offshore health service provider, ambulance service under circumstances in which the provisions of R.S. 40:1237.1 are not applicable, certified registered nurse anesthetist, nurse midwife, licensed midwife, nurse practitioner, clinical nurse specialist, pharmacist, optometrist, podiatrist, chiropractor, physical therapist, occupational therapist, psychologist, social worker, licensed professional counselor, licensed perfusionist, licensed respiratory therapist, licensed radiologic technologist, licensed clinical laboratory scientist, or any nonprofit facility considered tax-exempt under Section 501(c)(3), Internal Revenue Code, pursuant to 26 U.S.C. 501(c)(3), for the diagnosis and treatment of cancer or cancer-related diseases, whether or not such a facility is required to be licensed by this state, or any professional corporation a health care provider is authorized to form under the provisions of Title 12 of the Louisiana Revised Statutes of 1950, or any partnership, limited liability partnership, limited liability company, management company, or corporation whose business is conducted principally by health care providers, or an officer, employee, partner, member, shareholder, or agent thereof acting in the course and scope of his employment.

14

> Financial responsibility of a health care provider under this Section may be established only by filing with the board proof that the health care provider is insured by a policy of malpractice liability insurance in the amount of at least one hundred thousand dollars per claim with qualification under this Section taking effect and following the same form as the policy of malpractice liability insurance of the health care provider, or in the event the health care provider is self-insured, proof of financial responsibility by depositing with the board one hundred twenty-five thousand dollars in money or represented by irrevocable letters of credit, federally insured certificates of deposit, bonds, securities, cash values of insurance, or any other security approved by the board.

Dr. Odudu testified that he is an independent contractor working for Global Physicians Network, LLC ("GPN"), an entity that, through its subsidiaries, contracted with various medical facilities to staff emergency rooms with physicians. Dr. Odudu testified that he entered into independent contractor agreements with two of GPN's subsidiaries, GPN Ferriday, LLC ("GPN Ferriday") and GPN Leesville, LLC ("GPN Leesville"). As a contractor for GPN Ferriday, Dr. Odudu provided emergency room services at Riverland Medical Center ("Riverland ER") from May 15, 2017, through December 31, 2018, including the time of Mr. Dickson's treatment in September 2018. As a contractor for GPN Leesville, Dr. Odudu provided services at Byrd Regional Hospital ("Byrd Hospital") from May 1, 2018, through April 30, 2019. Thus, at the time he provided services to Mr. Dickson, Dr. Odudu was a qualified health care provider working at both Riverland ER and Byrd Hospital. Dr. Odudu testified that even though GPN Ferriday lost its contract with Riverland ER and ceased operations in December 2018, he continued working at Riverland ER through the new staffing entity. Dr. Odudu also testified that he continued working for GPN Leesville at Byrd Hospital through April 2019.

Dr. Odudu produced an NF&M Policy (No. ES034806) that was issued to GPN as the First Named Insured, which provided him insurance in the amount of $100,000.00 per claim and $300,000.00 in aggregate.[3] According to Dr. Odudu, GPN was responsible for ensuring that he was registered as a qualified health care provider with the PCF and for paying the requisite surcharges. Melinda Floyd, who was retained by GPN to assist it in obtaining the NF&M policy, testified that she forwarded the NF&M policy to the PCF along with copies of Physician Rosters, which listed all the physicians working for GPN. Ms. Floyd testified that Dr. Odudu was listed on the Physician Rosters that was provided to the PCF for GPN Ferriday for his work at Riverland ER that started on May 15, 2017, and GPN Leesville for his work at Byrd Hospital that started on May 1, 2018.

After a review of the jurisprudence, we find merit to Dr. Odudu's argument that the surcharge requirement was met because at the time he treated Mr. Dickson, he was registered twice with the PCF as a qualified provider under the NF&M policy, once for his work on behalf of GPN Ferriday at Riverland ER, and a second time for his work for GPN Leesville at Byrd Hospital. Dr. Odudu cites to *St. Paul Fire & Marine Ins. Co. v. Eusea*, 99-2117 (La.App. 1 Cir. 9/22/00), 775 So.2d 32, *writ denied*, 791 So.2d 116 (La. 4/27/01) & *writ denied*, 791 So.2d 117 (La. 4/27/01), for the proposition that "Louisiana law is clear that a physician cannot be partially qualified by the PCF; he is simply qualified." In *St. Paul Fire*, the first circuit found that a physician who worked as a resident at a clinic and moonlighted at a hospital became a "qualified health care provider" by filing as proof of financial responsibility the malpractice policy that covered the moonlighting, and

_____

[3] Dr. Odudu's Contractor Agreements with GPN Leesville and GPN Ferriday required that those entities provide him with professional liability insurance, and this obligation was met by GPN when it purchased the NF&M Policy.

thus, the physician's liability for malpractice that occurred at the clinic and was covered by a different insurer was limited to $100,000, even though the physician paid only one surcharge and subjected the PCF to claims arising out of the residency. In so ruling, the first circuit stated:

> We cannot accept [the plaintiff's] interpretation that *Williams* [*v. Golden,* 611 So.2d 713 (La.App. 4th Cir.1992)] requires a separate surcharge be paid to the PCF on behalf of a qualified health care provider for each malpractice insurance policy covering the provider. The Act does not mandate a health care provider paying multiple surcharges in order to achieve qualified status. Moreover, qualification is a status granted to health care providers, not insurance companies. Only the health care provider can take steps to qualify under the Act and avail himself of the Act's benefits. . . .
>
> . . . .
>
> The requirements of LSA—R.S. 40:1299.42 [now 40:1231.2] do not contemplate partial qualification of health care providers. . . .
>
> Clearly, Dr. Blanchard satisfied the requirements of LSA—R.S. 40:1299.42 to obtain his status as a qualified health care provider under the Act. Accordingly, Dr. Blanchard's qualified health care provider status cannot be limited by the exclusions of the Medical Protective policy he filed as proof of his financial responsibility.

*Id.* at 37-39.

The fourth circuit in *Bickham v. LAMMICO*, 11-900, p. 7 (La.App. 4 Cir. 02/01/12), 90 So.3d 467, 472, *writ denied*, 12-782 (La. 5/25/12), 90 So.3d 413 also found that "a separate surcharge is not required to be paid to the PCF on behalf of a qualified healthcare provider for each malpractice insurance policy covering the provider." The court further stated that the "Act does not mandate a healthcare provider pay multiple surcharges in order to achieve qualified status. Moreover, qualification is a status granted to healthcare providers, not insurance companies. Only the healthcare provider can take steps to qualify under the Act and avail himself of the Act's benefits." *Id.* at 472.

Louisiana jurisprudence clearly supports Dr. Odudu's argument that if a health care provider is qualified for one purpose or at one facility or location, he is qualified for all purposes. In this case, Dr. Odudu only had one policy filed with the PCF, the NF&M Policy that served as proof of insurance coverage in the amount of $100,000.00 for him to be a qualified provider at both the GPN Ferriday and GPN Leesville locations. According to the trial testimony, GPN purchased the proper tail coverage (also called an extended reporting endorsement) in the amount of $151,531.00 for Dr. Odudu's NF&M policy on May 1, 2019. It is undisputed that Dr. Odudu was a qualified health care provider for his services at GPN Leesville at all relevant times and that GPN paid for a two-year tail coverage (or surcharge) upon GPN Leesville ceasing to do business on May 1, 2019, which covered all claims against Dr. Odudu until May 1, 2021. Because the NF&M policy was in place at the time the alleged malpractice occurred in September 2018, and because the tail coverage or surcharge covered claims against Dr. Odudu until May 2021, we agree with the trial court's finding that Dr. Odudu remained a qualified health care provider with the PCF on August 27, 2019, the date that Mr. Dickson filed his petition against Dr. Odudu. This finding pretermits our consideration of the Oversight Board's remaining assignments of error.

For these reasons, we affirm the trial court's judgment that granted Dr. Odudu's exception of prematurity and dismissed this case without prejudice. All costs are assessed to appellant, the Patient's Compensation Fund Oversight Board.

**AFFIRMED.**